David GIORDANO, Plaintiff–Appellant,

v.

CITY OF NEW YORK, Howard Safir, Police Commissioner, New York City Police Department, Medical Board, Police Pension Fund, Article II, Defendants–Appellees.

Docket No. 01–7370.

United States Court of Appeals, Second Circuit.

Argued Oct. 25, 2001.

Decided Dec. 21, 2001.

Rosemary Carroll, Carroll & Friess, New York, NY, for Plaintiff–Appellant.

Cheryl Payer, New York City Law Department (Michael D. Hess, Corporation Counsel of the City of New York; Stephen J. McGrath, of counsel), New York, NY, for Defendants–Appellees.

Before: VAN GRAAFEILAND, WINTER, and SACK, Circuit Judges.

SACK, Circuit Judge.

Plaintiff David Giordano, a former long-standing employee of the New York City Police Department ("NYPD"), appeals from a judgment of the United States District Court for the Southern District of New York (Allen G. Schwartz, *Judge*) granting summary judgment to the defendants and dismissing his complaint in its entirety. The complaint alleges violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Due Process and Equal Protection Clauses of the United States Constitution, the New York State Executive Law, and the New York City Administrative Code.

Giordano's claims arise from his discharge from the NYPD following a hearing before the defendant Medical Board, Police Pension Fund, Article II ("Article II Board"), which recommended that Giordano "be separated from the Police Department because of [his need for] life long anticoagulation." Giordano alleges that the defendants discharged him in violation of the ADA because they mistakenly "regard[ed] him as disabled" because of his regimen on the drug Coumadin, an anticoagulant. He further alleges that by discharging him without affording him a personal physical examination by the Article II Board and by continuing to employ another full-duty police officer, Thomas Rowe, who also takes Coumadin daily, the defendants violated his constitutional rights under, respectively, the Due Process and the Equal Protection Clauses of the Fourteenth Amendment. Finally, Giordano alleges that the defendants' actions violated his right "to be free of inten-

tional discrimination based on disability," Compl. ¶ 57, as defined by the New York State Executive Law and the New York City Administrative Code.

We affirm the district court's dismissal of Giordano's ADA claim because we agree that he failed to offer evidence from which a reasonable juror could conclude that the defendants "regarded him as disabled" within the meaning of the ADA. We also affirm the court's dismissal of Giordano's § 1983 claims. The record contains nothing to suggest that the· alleged disparate treatment of Giordano and Officer Rowe resulted from any illicit motivation of the defendants. We recognize that we have not yet decided whether the Supreme Court's decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), altered this Circuit's rule that a "class of one" plaintiff such as Giordano must show an illicit motivation in order to state a cognizable equal-protection claim. *See Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001). We affirm without reaching this issue, however, because Giordano did not in any event introduce evidence to show that the defendants *"intentionally* treated [him] differently from others· similarly situated." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073 (emphasis added). Finally, we agree with the district court that contrary to Giordano's assertion, due process of law did not require the members of the Article II Board to conduct a personal physical examination of Giordano before recommending his discharge from the NYPD.

Because we hold that Giordano failed to introduce evidence to suggest that the defendants "regarded him as disabled," we do not reach the other ADA issues discussed by the district court: whether patrol duty is an "essential function" of police work, and, if so, whether Giordano was able to perform this function with or without reasonable accommodation. Finally, we disagree with the district court's conclusion that Giordano's pendent state-law claims necessarily fail because even though those laws "have a broader definition of disability than does the ADA," they otherwise "use the same analytical framework as the ADA." *Giordano v. City of New York,* No. 99 Civ. 3649, 2001 WL 204202, at *7, 2001 U.S. Dist. LEXIS 2039, at *19 (S.D.N.Y. Feb.28, 2001). We therefore reverse the district court's grant of summary judgment against Giordano on his pendent state-law claims and remand with instructions to dismiss them without prejudice to their renewal in an appropriate state forum.

## BACKGROUND

Giordano began working for the NYPD on January 21, 1985, at the age of twenty. After he graduated from the Police Academy, he spent approximately three years in training in a precinct in Queens. The NYPD then assigned him to patrol duty elsewhere. According to Giordano, patrol duty means "police duty in a radio car or on foot in a sector," Appellant's Br. at 11 n. 6, and according to the testimony of NYPD Personnel Chief Michael A. Markman, it involves, *inter alia,* "rendering all necessary police service in an assigned area ... [and] giving attention to crime hazards."

In April 1991, the NYPD reassigned Giordano to the Central Park Precinct in Manhattan. There, he initially performed patrol duty; later, he served in the Street Narcotics Enforcement Unit. He continued to work in the latter capacity until 1998. His performance evaluations indicate that he fulfilled his duties not only competently, but at a level above average.

In 1998, Giordano's physicians diagnosed an aneurism in his aortic root. On May 19, 1998, Dr. Donato Sisto, a surgeon, per-

formed corrective surgery to replace the root with an aortic valve prosthesis. The operation was successful, and on May 24, 1998, Dr. Sisto authorized Giordano's discharge from the hospital. To prevent the danger of blood clotting, a risk associated with the presence of an artificial aortic valve in the body, Giordano's physicians instructed him to take five milligrams of Coumadin, an anticoagulant blood thinner, daily. It is expected that Giordano will be required to take Coumadin for the rest of his life.

In all other respects, according to Dr. Demetrios Georgiou, one of Giordano's cardiologists, "Mr. Giordano can conduct a normal lifestyle, including regular exercise training." Letters provided by Giordano's physicians at his attorney's request affirm that he remains in good health, takes his medication as directed, and complies meticulously with the periodic monitoring schedule recommended by his physicians. Giordano also emphasizes that he exercises regularly, controls his diet, and neither smokes nor drinks.

Giordano apparently recovered from his operation rapidly. On July 9, 1998, then-Police Commissioner Safir[1] authorized him to return to work on "restricted duty," which, according to Personnel Chief Markman, limits an officer to "clerical, administrative and other non-patrol duties."[2]

On September 14, 1998, Dr. Eliscer Guzman, Giordano's district surgeon and a cardiologist by training, recommended Giordano for "survey"—i.e., an investigation—"to ascertain whether [an NYPD employee] is incapacitated for the performance of duty and ought to be retired."[3] Giordano testified that Dr. Guzman "told [him] that because [he] take[s] Coumadin [he] could bleed to death in the event of a blow or physical attack and that [he] should put in [his] papers to retire." Concluding that he "had no option," Giordano applied for accident-disability retirement on the same day.

On September 17, 1998, the NYPD referred Giordano's case to Dr. Robert Thomas, Supervising Chief Surgeon of the NYPD. Dr. Thomas testified that he "prepared a memorandum to the Police Commissioner recommending the plaintiff not be permitted to perform any patrol duties and be considered for disability retirement." He based this recommendation on the views of "a number of physicians, including two department vascular surgeons," who "were of the opinion that the anticoagulation needed for plaintiff's prosthetic aortic valve would preclude plaintiff from performing full duty because plaintiff could sustain catastrophic bleeding from even minor injuries."

On September 21, 1998, Giordano consulted Dr. Gregory Fried, Executive Chief Surgeon of the NYPD. Dr. Fried testified that over the course of his career with the NYPD, he has examined thousands of police officers—including others who, like Giordano, must take Coumadin—in order to assess their fitness for duty. He further testified that he generally considers two principal questions to determine

---

1. Howard Safir, a named defendant, is no longer the NYPD's commissioner. Because Giordano sued Safir "in his official capacity," however, Bernard B. Kerik, the present commissioner, "shall be automatically substituted" for his predecessor pursuant to Fed. R.Civ.P. 25(d).

2. Markman also testified that if a restricted-duty officer cannot return to full duty within one year, he will be "recommended by the police commissioner to be retired from the NYPD."

3. Dr. Gregory Fried, Executive Chief Surgeon of the NYPD, testified that a "PC [police commissioner] survey" is "a request for evaluation" by the Article II Board, which is comprised of "three independent physicians who evaluate whether or not a police officer is capable of resuming full duty or should be retired."

whether such officers can be returned to patrol duty: first, the nature and extent of other physical impairments, if any; and second, "the wishes of the officer." At his deposition, Dr. Fried explained that:

> different people with varying lifestyles have more difficulty controlling the amount of anticoagulation and each patient has to be individually evaluated, so that we find people who can't comply or change their diet or change their activities and it causes variation in the amount of anticoagulation or[,] in lay terms, the bleeding tendency of a person because of the Coumadin.

After discussing Giordano's case with him and evaluating various medical reports, including those of the cardiologists who examined Giordano, Dr. Fried personally restored Giordano to patrol duty.[4] One week later, on September 28, 1998, Giordano withdrew his application for accident-disability retirement.

Immediately after his consultation with Dr. Fried, Giordano returned to work as a full-duty officer in the Central Park Precinct Street Narcotics Enforcement Unit. He continued to work in this capacity until January 5, 1999, when Commissioner Safir again placed him on restricted duty. Giordano asserts that during the interim he made arrests that "required the use of physical force," and even though he "incurred some bruising," these wounds did not cause catastrophic bleeding. He also reports that he did not experience any problem with excessive bleeding after undergoing a minor skin operation in December 1999.

On October 15, 1998, Dr. Thomas officially discontinued Giordano's survey. The record suggests, however, that the survey continued unofficially. Two months later, on December 18, 1998, Dr. Thomas sub-

mitted a "Recommendation for Examination by Article II Medical Board." On January 5, 1999, Commissioner Safir authorized the Article II Board examination pursuant to Section 13–251 of the Administrative Code of the City of New York, and he again placed Giordano on restricted duty.

Captain James O'Neil, the officer in charge of the Central Park Precinct, then reassigned Giordano to the position of "Community Affairs Officer," evidently because it would be likely to involve fewer direct risks of physical confrontation and injury. Personnel Chief Markman testified, however, that even the "position of Community Affairs Officer ... requires the officer assigned to that position to perform," *inter alia*, "patrol functions."

On March 15, 1999, the Article II Board conducted its examination of Giordano's fitness for duty. The Board concluded that his need to take Coumadin rendered him "physically-mentally incapacitated for performance of duty," and that he should therefore be retired. Giordano argues that New York law required the Board to conduct an individual physical examination of him before issuing its recommendation. The Board instead relied exclusively on the reports of other physicians. It "agree[d] with the[ir] almost unanimous opinions ... that [Giordano] should be separated from the Police Department because of life long anticoagulation which he requires, and should not be on either full duty or patrol." It noted that "the only dissenting opinion [among those physicians] is that of Dr. Gregory Fried." The Board disapproved Giordano's application for accident-disability retirement, concluding that his disability arose from a birth

---

4. Giordano's affidavit states that Dr. Fried restored him to full duty on September 19, although his brief, like Dr. Fried's testimony, places the date "[o]n or about September 21, 1998."

defect unrelated to his employment by the NYPD.

On May 18, 1999, Giordano filed suit against the City, the Police Commissioner, and the Board in the United States District Court for the Southern District of New York. He brought federal claims under the ADA and 42 U.S.C. § 1983 and pendent state-law claims under the New York State Executive Law and the New York City Administrative Code. Following discovery, the parties cross-moved for summary judgment.

On February 28, 2001, the district court granted summary judgment to the defendants on all claims. First, it held that Giordano did not qualify as "disabled" within the meaning of the ADA because, contrary to Giordano's argument, the evidence did not suggest that the defendants "regarded him as having a disability." *See Giordano*, 2001 WL 204202, at *3–*5, 2001 U.S. Dist. LEXIS 2039, at *7–*13. While this conclusion alone disposed of Giordano's ADA claim, the court went on to consider whether, assuming Giordano did qualify as "disabled" under the ADA, he could establish the "third element of his *prima facie* case": qualification, with or without accommodation, to perform the "essential functions" of an NYPD police officer. *Id.*, 2001 WL 204202, at *5–*6, 2001 U.S. Dist. LEXIS 2039, at *13–*18. The court concluded that patrol indeed constitutes an "essential function" of NYPD police work and that because Giordano cannot show he can perform this function without posing a danger to himself or others, he cannot demonstrate that he was "otherwise qualified" for the job of an NYPD police officer. *See id.*, 2001 WL 204202, at *6, 2001 U.S. Dist. LEXIS 2039, at *18.

The court briefly acknowledged that New York state and municipal laws define "disability" in broader terms than the ADA. But it noted that these laws are enforced under the same analytic framework as the ADA. Giordano's pendent state-law claims, the court therefore concluded, failed under the "essential functions" analysis that the court elaborated on in the immediately preceding section of its opinion, in connection with Giordano's ADA claim. *See id.*, 2001 WL 204202, at *7, 2001 U.S. Dist. LEXIS 2039, at *19.

Turning to Giordano's constitutional claims, the court first dismissed Giordano's equal-protection claim because it found no "impermissible motive" on the part of the defendants. *Id.*, 2001 WL 204202, at *7, 2001 U.S. Dist. LEXIS 2039, at *19–*20. It then dismissed his due-process claim because it concluded that the Article II Board's evaluation provided all the process that was due. *See id.*, 2001 WL 204202, at *7, 2001 U.S. Dist. LEXIS 2039, at *20–*23.

This appeal followed.

## DISCUSSION

### I. Standard of Review

We review *de novo* the district court's grant of summary judgment, construing the evidence in the light most favorable to the nonmoving party. *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), *cert. denied*, 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). A district court must grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.*

## II. Giordano's ADA Claim

■ The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to," *inter alia,* "discharge of employees." 42 U.S.C. § 12112(a). To make out a *prima facie* case under the ADA, a plaintiff must establish that:

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*Heyman v. Queens Vill. Comm. for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999) (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998)).

Giordano indisputably satisfies the first and fourth of these elements. The NYPD is an "employer" because it is "engaged in an industry affecting commerce" and employs "15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year," 42 U.S.C. § 12111(5)(A); and Giordano's involuntary retirement from the NYPD plainly falls within the scope of "adverse employment action," *see id.* § 12112(a) (prohibiting discrimination with regard to, *inter alia,* "discharge of employees"). We conclude, however, that Giordano is not "disabled" within the meaning of the ADA and therefore fails to satisfy the second element of his *prima facie* case.

## A. The Definition of Disability Under the ADA

■ Title 42 U.S.C. § 12102(2) defines a disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities ...;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

*Id.* Because the Equal Employment Opportunity Commission ("EEOC") is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms. *See Bartlett v. N.Y. State Bd. of Law Exam'rs,* 226 F.3d 69, 79 (2d Cir.2000); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 150 n. 3 (2d Cir.1998).

The EEOC defines a "physical or mental impairment" as a "physiological disorder, or condition" that affects one of the major "body systems," which include the cardiovascular system. *See* 29 C.F.R. § 1630.2(h)(1). To qualify as a disability under the ADA, the relevant impairment must also be of a nature that "substantially limits one or more of the major life activities," 42 U.S.C. § 12102(2)(A); and "working" is among those activities. *See* 29 C.F.R. § 1630(i). In general, an impairment "substantially limits" a major life activity if it renders a person either (i) "unable" to perform a major life "activity that the average person in the general population can perform"; or (ii) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform [that] activity" in comparison to "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). But where, as here, the activity is "working," the EEOC regulations define "substantially limits" more precisely:

> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having com-

parable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.* § 1630.2(j)(3); *see also Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (discussed below); *Bartlett,* 226 F.3d at 82–85 (discussing and applying *Sutton* on remand from the Supreme Court for that purpose). The Court has therefore noted that "[t]o be substantially limited in the major life activity of working ..., one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139.

### B.  Giordano's "Disability"

Giordano asserts that he is "disabled" within the meaning of the ADA, but not because Coumadin *in fact* substantially limits him in the major life activity of "working" as defined in 42 U.S.C. § 12102(2)(A). To the contrary, Giordano argues that he remains fully qualified and capable of performing his work as a full-duty police officer. He avers, however, that the defendants erroneously *"regard him as disabled"* within the meaning of 42 U.S.C. § 12102(2)(C). Appellant's Br. at 14 (emphasis added). They mistakenly believe, he asserts—and the defendants, indeed, readily acknowledge that they believe—that Coumadin renders Giordano "unable to safely perform the essential functions of [a police officer] without danger to himself and others." Appellees' Br. at 29. As Dr. Thomas, on whose report the Article II Board relied in recommending Giordano's involuntary retirement, concluded: The "plaintiff could sustain catastrophic bleeding from minor injury and should not perform patrol functions."

### C.  Analysis

Under 42 U.S.C. § 12102(2)(C) ("regarded as disabled"), the decisive issue is the employer's *perception* of his or her employee's alleged impairment. *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999); *Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir.1997). Giordano must show not only that the defendants "regarded [him] as somehow disabled," but that they "regarded [him] as disabled *within the meaning of the ADA." Colwell,* 158 F.3d at 646 (citing *Francis,* 129 F.3d at 285–86) (emphasis in original). To prevail under § 12102(2)(C), Giordano therefore must establish that the defendants perceived him as substantially limited in his ability to perform a major life activity—in this case, "working."

Giordano introduced voluminous evidence to establish that his employer, the NYPD, regarded him, correctly or incorrectly, as unable to work as a NYPD police officer because he must take Coumadin; and the defendants concede, both in the district court and on appeal, that they "sought to survey plaintiff from the position of a full duty police officer, because ... he is unable to safely perform the essential functions of [that position] without danger to himself and others." Appellees' Br. at 29.

In *Sutton,* the Supreme Court explained that an employee can be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." 527 U.S. at 489, 119 S.Ct. 2139. Giordano's allegations fall within the latter category. The defendants, he

alleges, mistakenly think that Coumadin's effects on his potential to experience excessive bleeding from a minor injury "substantially limit" him from the major life activity of "working." The decisive issue, then, is whether Giordano introduced evidence to support the allegation that the defendants regarded him as disqualified not only from full-duty patrol as an NYPD police officer but from "working."

In *Colwell,* we held that the "[c]ontinuous assignment of [policemen] to non-confrontational positions does not permit the inference that the officers were regarded as *substantially limited* in their ability to do work.... The fact that the officers were believed to be unable to wrestle with disturbers of the peace is not enough." 158 F.3d at 647 (emphasis in original). There, the Suffolk County Police Department assigned certain officers to "light duty," which relieved all officers so assigned from substantial risk of confrontation. *See id.* at 639. Here, by contrast, Personnel Chief Markman testified that the NYPD has "no full duty/non-patrol positions" to which it could assign Giordano.[5] The NYPD therefore argues that it could not, in effect, place Giordano on the equivalent of "light duty."

This does not mean, however, that the defendants regarded Giordano as disabled from a "broad class of jobs" compared to "the average person having comparable training, skills, and abilities." *Bartlett,*

226 F.3d at 82 (internal quotation marks and citation omitted). Giordano introduced evidence that establishes at most that the defendants regarded him as disabled from police or other investigative or security jobs that involve a substantial risk of physical confrontation. The record contains no evidence from which we can infer that the defendants thought, or had grounds for thinking, that other jobs in the public or private sector—such as, for example, a job as a security guard or a private investigator, or with a police department that does not require every officer to be capable of patrol duty—carry the same nature or degree of risk. Giordano stated in an affidavit that the very "duties of police officer which defendants claim [he] cannot perform are the kinds of duties which [he] would have to perform ... as a private investigator and/or in security which are really the only related fields for which [he is] qualified." The district court correctly noted, however, that Giordano adduced no evidence of the qualifications for these jobs. His assumption that his disqualification from the specific duties of an NYPD police officer will preclude him from working in related fields—or that the defendants perceived him as such—is, as the district court noted, "[s]peculation and conjecture," which will not suffice "to defeat a motion for summary judgment." *Giordano,* 2001 WL 204202, at *4, 2001 U.S. Dist. LEXIS 2039, at *11 (citing *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51

---

5. While it does not affect our disposition of this appeal, we note that Giordano introduced evidence than tends to call this proposition into doubt. Certain positions, such as "Community Affairs Officers," appear to involve a substantially decreased risk of physical confrontation. The deposition of Officer Rowe also establishes that at least one Coumadin-medicated police officer continues to work as a "full-duty/patrol" officer in the NYPD. The distinction between the situations of Officer Rowe and Giordano is not apparent. This evidence does not, however, suggest that the

defendants in fact "regarded" Giordano as disabled from less confrontational jobs that involve comparable skills, training, and ability; the defendants' claim is that no such jobs exist *in the NYPD.* Whether this claim is accurate or not says nothing about the defendants' perception of Giordano's ability to perform such jobs. *See Francis,* 129 F.3d at 284 (noting that, under the "regarded as" prong, qualification as "disabled" under the ADA "turns on the employer's perception of the employee"); *Colwell,* 158 F.3d at 646 (citing *Francis* ).

(2d Cir.1996)); *see also Tubens v. Police Dep't,* 48 F.Supp.2d 412, 419 (S.D.N.Y. 1999) (noting that the plaintiff "has demonstrated at most that the NYPD perceived her as substantially limited in performing only a narrow range of jobs—those requiring regular strenuous isometric exercise," and that "[the plaintiff] has not provided specific evidence about the kinds of jobs for which she alleges the NYPD perceived her to be disqualified").

■■ We thus find no evidence in the record that suggests that the defendants perceived Giordano as unable to work in a "broad class of jobs." Giordano had the burden of proof on the issue. *See Colwell,* 158 F.3d at 647 (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 872 (2d Cir. 1998)). We therefore affirm the district court's grant of summary judgment to the defendants on Giordano's ADA claims.

### III. Giordano's Claims Under 42 U.S.C. § 1983

■■ Giordano further asserts two constitutional violations: first, that by discharging him but continuing to employ Officer Rowe, another officer who takes Coumadin, the defendants denied Giordano the equal protection of the laws; and second, that by declining to examine Giordano personally before recommending his discharge from the NYPD, the Article II Board deprived him of a property interest without due process of law. Giordano brings each of these allegations under 42 U.S.C. § 1983. To state a cause of action under § 1983, Giordano must allege (1) that the defendants deprived him of a right "secured by the Constitution or laws of the United States"; and (2) that they did so "under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *accord Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999); *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

The defendants, a municipal corporation and employees of its law-enforcement agency, were plainly acting "under color of state law" in their dealings with Giordano. *See Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We conclude, however, that Giordano fails to make out a cognizable violation of his rights under either the Equal Protection Clause or the Due Process Clause.

### A. Equal Protection

Giordano alleges that "by continuing the employment of P.O. Rowe," who also takes Coumadin, but terminating Giordano for this reason, the defendants deprived him of the "Equal Protection of the Law in violation of the 14th Amendment." Compl. ¶ 56. Giordano thus alleges a form of selective enforcement: that the defendants "surveyed" and discharged him because he must take Coumadin but took no action against a similarly situated NYPD officer. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (noting that the "Equal Protection Clause ... is essentially a direction that all persons similarly situated should be treated alike") (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)).

Before the Supreme Court's recent decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam), we held repeatedly that a selective-enforcement claim based on the Equal Protection Clause must allege that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitu-

tional rights, or malicious or bad faith intent to injure a person." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999) (quoting *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir.1980))) (internal quotation marks omitted). Under this test, Giordano's equal-protection claim would plainly fail. While the NYPD's rationale for its disparate treatment of Rowe and Giordano remains nebulous, no evidence in the record on appeal suggests any "impermissible motive"; nor did Giordano allege one in his complaint. *See* Compl. ¶ 56.

Giordano contends, however, that the defendants must at a minimum "articulate a rational basis for the difference in treatment." Appellants' Br. at 28. Giordano does not elaborate on this argument. But he may be relying tacitly on a contention we considered but declined to decide previously: "that the Supreme Court's decision in *Olech* ... remov[ed] the requirement that malice or bad faith be shown in order to state a valid 'class of one' equal protection claim." *Harlen*, 273 F.3d at 499.

■ As in *Harlen*, we decline to resolve this issue because its resolution would not affect the outcome of this appeal. Assuming without deciding that *Olech* changed this Circuit's requirement that a "class of one" plaintiff alleging an equal-protection violation show an illicit motivation, such a plaintiff would still be required to show, not only "irrational and wholly arbitrary" acts, *Olech*, 528 U.S. at 565, 120 S.Ct. 1073 (internal quotation marks omitted), but also *intentional* disparate treatment. *See id.* at 564, 120 S.Ct. 1073 (observing that the Court's cases have recognized "class of one" equal-protection claims "where the plaintiff alleges that she has been *intentionally* treated differently from others similarly situated and that there is no rational basis for the difference in treat-

ment") (emphasis added); *see also Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (noting that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against *intentional* and arbitrary discrimination") (internal quotation marks and citation omitted; emphasis added).

■ Giordano points to no evidence in the record that would support a jury finding that those responsible for terminating him because of his Coumadin use knew that they were treating him differently from anyone else. Giordano submitted evidence that the NYPD continues to employ Rowe even though he, like Giordano, must take Coumadin. Rowe testified that the "Police Department" was aware that he must take Coumadin but that, to date, the "Police Department medical unit" has not questioned him for this reason. Dr. Fried, the NYPD's executive chief surgeon, also testified that he knew that Officer Rowe at one time took Coumadin. This evidence provides no basis, however, for imputing knowledge of disparate treatment of Giordano to the defendants whom Giordano alleges violated his rights under the Equal Protection Clause. The record contains nothing to suggest that the physicians who "surveyed" Giordano, the three physicians comprising the Article II Board that recommended his termination, or the police commissioner who did ultimately terminate Giordano had any knowledge of Officer Rowe's condition, or of the condition of anyone else retained as an NYPD police officer despite an anticoagulant regimen. Absent some evidence of this knowledge, no reasonable juror could infer that the defendants intended to treat Giordano differently from other NYPD officers. Because we find no evidence in the record to support a jury's finding of intentional dis-

crimination, we affirm the district court's grant of summary judgment to the defendants on Giordano's equal-protection claim.

### B. Due Process

■ Giordano also claims that the defendants deprived him of his property interest in continuing employment without due process of law. *See* U.S. Const. amend. XIV § 1. He contends on appeal that he had a right "to know the evidence against him and to be heard in opposition to coerced retirement," and he objects to what he characterizes as an *"ex parte"* determination by the Article II Board. Appellant's Br. at 27. Giordano did not make this claim before the district court. We find no "manifest injustice" in not permitting him to make this argument for the first time on appeal. We therefore will not consider it. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).[6]

■ Giordano also argues on appeal that due process of law required the defendant Article II Board to conduct a personal physical examination of him before recommending his discharge to the police commissioner. This claim he *did* raise in the district court, and he reasserts it briefly on appeal. Compl. § 55; Appellant's Br. at 27. He alleges that the New York City Administrative Code requires the Article II Board *itself* to examine him physically before recommending his involuntary retirement.

The New York City Administrative Code provides in pertinent part:

a. The board of trustees shall retire any member who, upon an examination,

as provided in subdivision d of this section, may be found to be disqualified, physically or mentally, for the performance of his or her duties. . . .

. . . .

d. All medical examinations required by or made pursuant to the provisions of this subchapter shall be conducted by a medical board appointed by the commissioner. . . .

N.Y. City Admin. Code § 13–206; *see generally Cohen v. Valentine,* 58 N.Y.S.2d 415 (Sup.Ct. N.Y. County 1945) (articulating the procedures that must be followed by the New York City Board of Trustees before it may retire a police officer for physical disability), *aff'd,* 271 A.D. 952, 67 N.Y.S.2d 708 (1st Dep't 1947). The district court concluded that "[t]he plain language of the provisions in question does not call for a 'physical examination' or an 'in-person examination.' . . . If the Board, composed of three medical doctors, believed that it could adequately assess plaintiff without an in-person examination, this Court will not require an in-person examination when the City Council has not seen fit to do so." *Giordano,* 2001 WL 204202, at *8, 2001 U.S. Dist. LEXIS 2039, at *22. We agree. No fewer than six physicians expressed views on Giordano's fitness to work as an NYPD police officer. Some of these physicians examined Giordano in person, and the Article II Board reviewed their reports as well as the medical records from Giordano's surgery. We see no basis for holding that as a matter of constitutional due process, the Article II Board, comprised of three physicians who presumably possess the expertise to evalu-

---

**6.** In any event, this claim appears to be meritless. *See Calzerano v. Bd. of Trs. of Police Pension Fund,* 877 F.Supp. 161, 164 (S.D.N.Y. 1995) (holding that due process in the context of a disability-retirement hearing before the Police Department's Board of Trustees does not require "an opportunity to be heard in person" and that an opportunity to submit arguments and the opinion of physicians in writing satisfies the Due Process Clause); *Flannelly v. Bd. of Trs. of N.Y.C. Pension Fund,* 6 F.Supp.2d 266, 268 (S.D.N.Y.1998) (same; collecting cases).

ate medical records, is also required to conduct what may be no more than a perfunctory physical examination of each potential retiree whom it is called upon to assess under N.Y. City Admin. Code § 13–206. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that the "specific dictates of due process" must be determined by weighing (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedures"; and (3) the government's "fiscal and administrative" interests). On this appeal, we conclude that "the probable value, if any, of additional or substitute procedures"—namely, the additional physical examination by the Article II Board itself to which Giordano asserts a right—would be insignificant. Finally, we note that we have held that due process in this context does not require an adversarial hearing before the City's Board of Trustees, which possesses the ultimate authority to accept or reject the Article II Board's recommendation. *See Basciano v. Herkimer,* 605 F.2d 605, 611 (2d Cir.1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979); *see also Calzerano v. Bd. of Trs. of the Police Pension Fund,* 877 F.Supp. 161, 164 (S.D.N.Y.1995). It is *a fortiori* improbable that due process in this context requires the particular procedure—i.e., a personal medical exam—that Giordano claims the subordinate Article II Board should have conducted before making its recommendation to that Board of Trustees.[7]

### IV. Giordano's Pendent State Law Claims

Because we affirm the district court's dismissal of Giordano's ADA claim on the ground that he does not qualify as disabled within the meaning of 42 U.S.C. § 12102(2), we do not reach any of the questions discussed by the district court in its further analysis of the ADA. *See Giordano,* 2001 WL 204202, at *5–*7, 2001 U.S. Dist. LEXIS, at *13–*18. We do note, as did the district court, that the definitions of disability under the New York State Executive Law and the New York City Administrative Code are broader than the ADA definition. *See Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 233 (2d Cir.2000). According to the New York State statute, a "disability" is

(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment. . . .

---

**7.** We agree with the district court that *Coffran v. Bd. of Trs. of N.Y.C. Pension Fund,* 842 F.Supp. 723, 733 (S.D.N.Y.), *rev'd on other grounds,* 46 F.3d 3 (2d Cir.1995), which held that due process requires an adversarial hearing before the Board of Trustees before it may involuntarily retire a police officer based on a *psychiatric* disability, is distinguishable; indeed, Judge Keenan wrote in that case that a " 'medical determination' made on written evidence may be sufficient for [retirement based on] a physical disability." *Id.* at 732. On appeal, Giordano also cites *Gonzales v. Sandoval County,* 2 F.Supp.2d 1442, 1444 (D.N.M.1998), in support of the contention that the ADA requires the Board to conduct a personal examination of Giordano. Appellant's Br. at 27. *Gonzales,* however, simply confirms that a state statute-in that case, New Mexico's—"can only require fitness [of a police officer] to the extent permissible under the ADA—the level of fitness necessary to perform the essential functions of the relevant position, with or without reasonable accommodation." *Id.* at 1444. But Giordano does not contend that New York's statutes require a level of fitness inconsistent with the dictates of the ADA.

N.Y. Exec. Law § 292(21)(a). According to the City Code, "The term 'disability' means any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y. City Admin. Code § 8–102(16)(a). Neither of these definitions requires Giordano to show that his disability "substantially limits a major life activity." *See Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 706 (S.D.N.Y.1997) (observing that a person can be disabled within the meanings of New York's state and municipal laws even if his or her impairment does not substantially limit a major life activity); *accord Reeves*, 140 F.3d at 155 (same) (citing *Hazeldine* ).

As we noted in *Reeves*, the New York Court of Appeals, whose construction of New York State law binds this Court, *see, e.g., West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940), has confirmed that the definition of a disability under New York law is not coterminous with the ADA definition. *See Reeves*, 140 F.3d at 154–56 (citing and discussing *State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985)). While the district court recognized this distinction, it concluded that because these laws otherwise "use the same analytical framework as the ADA," Giordano's state-law claims fail for the same reasons elaborated in its analysis of the "essential functions" of a police officer under the ADA. *Giordano*, 2001 WL 204202, at *7, 2001 U.S. Dist. LEXIS, at *19.

Because we conclude that Giordano failed to introduce evidence that the defendants "regarded him as disabled" under the ADA, we do not reach these issues. We think that in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a "disability" as defined by New York state and municipal law is a question best left to the courts of the State of New York. While the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent state-law claims where all of the federal claims have been dismissed, *see id.* § 1367(c)(3), "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir.1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994), and *Baylis v. Marriott Corp.*, 843 F.2d 658, 664–65 (2d Cir.1988)). Indeed, we conclude that the state-law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present. *Cf. Robison v. Via*, 821 F.2d 913, 925 (2d Cir.1987) (remarking that it "may be an abuse of the district court's discretion" not to remand state-court claims especially when they involve "novel questions of state law").

Because we affirm the dismissal of his federal claim under the ADA for failure to show the requisite disability under federal law, we need not and do not reach the question of Giordano's qualifications to perform the essential functions of his job with regard to that claim. We also see no reason to address that issue with regard to the state and municipal claims, lest we

render a decision that does not accurately reflect New York law on the subject. Should this case come before New York courts on the state and municipal claims, we do not think that those courts should be bound, or think themselves bound, by principles of collateral estoppel or otherwise, to any findings or conclusions reached by the district court in its discussion of whether, as a matter of law, Giordano was qualified to perform the essential functions of his job. We ourselves do not intimate any view as to whether summary judgment for the defendants on the ADA claim based on this issue would have been proper. We therefore vacate the district court's judgment dismissing with prejudice the state and municipal claims and instruct the court to dismiss them without prejudice so that the state courts may adjudicate those claims in their entirety if the plaintiff chooses to pursue them in those courts.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants on Giordano's ADA and § 1983 claims. We vacate that part of the judgment granting summary judgment to the defendants on Giordano's state and municipal law claims, as well as the findings and conclusions set forth in section III(A)(ii) of the district court's opinion as to whether Giordano was otherwise qualified to perform the essential functions of his job. We remand with directions to dismiss the remaining claims without prejudice to their being brought in an appropriate state forum.