**OFFICE OF THE COMMISSIONER OF BASEBALL, Plaintiff,**

v.

**WORLD UMPIRES ASSOCIATION, Defendant.**

**No. 02 Civ. 5538(LAK).**

United States District Court, S.D. New York.

Jan. 28, 2003.

Howard L. Ganz, Daniel R. Halem, Proskauer Rose LLP, New York City, for Plaintiff.

Joseph J. Vitale, Cohen Weiss and Simon LLP, New York City, Joel A. Smith, Kahn, Smith & Collins, P.A., Baltimore, MD, Larry S. Gibson, Shapiro Sher Guinot & Sandler, Raleigh, MS, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

These cross-motions for summary judgment present the question of the effect to be given provisions in a collective bargaining agreement ("CBA") which ban third-party arbitration of disputes involving the discipline or termination of umpires.

### Facts

A. *The Dispute Resolution Procedures of the Collective Bargaining Agreement*

The Office of the Commissioner of Baseball (the "Commissioner's Office") and the World Umpires Association (the "WUA" or the "Union") are parties to a CBA cover-

ing the terms and conditions of employment of umpires employed by the Commissioner's Office.[1]

The CBA contains two mechanisms for resolving disputes. Disputes concerning umpire discipline or termination are governed solely and exclusively by Article 10, which states in relevant part:

"The procedures and remedies, if any, that are set out in this Article 10 shall be the sole and exclusive means available to an umpire (and to the Union) to challenge any decision by the Office of the Commissioner to discipline, or to terminate (for disciplinary, performance or other reasons) the employment of, an umpire. An umpire (and the Union) shall have no remedy or right of recourse other than those set out in this Article 10. Except as otherwise provided in this Article 10, any such decision by the Office of the Commissioner shall be final and binding. No decision by the Office of the Commissioner (including those review determinations by the Executive Vice President, Baseball Operations and the Commissioner of Baseball) made under this Article 10 shall be subject to the grievance procedure (Article 23) or to challenge in any other forum." [2]

The dispute resolution procedure for an umpire suspended without pay for seven days or less or fined $2,000 or less is to have the Executive Vice Present of Baseball Operations review the discipline.[3] The Vice President's decision "shall be final and binding and shall not be subject to the grievance procedure (Article 23) or to challenge in any other forum." [4]

The other dispute resolution mechanism is set forth in Article 23, which permits third-party arbitration of "grievances" that are not resolved informally. "Grievance" is defined as:

"any dispute or disagreement involving the interpretation or application of any provision of this Agreement. A claim that a rule, policy, directive or instruction issued by the Office of the Commissioner pursuant to Article 5.B of this Agreement is inconsistent with a provision of this Agreement, the Official Playing Rules [of Major League Baseball] or the [Major League Baseball Umpiring] Manual shall be considered a dispute or disagreement involving the interpretation or application of a provision of this Agreement." [5]

Article 23 refers to and restates the limitation in Article 10 of an umpire's right to challenge or dispute discipline or termination:

"Disputes involving the discipline or termination (for disciplinary, performance or other reasons) of any umpire shall not be considered a dispute or disagreement concerning the interpretation or application of a provision of this Agreement and shall not be subject to resolution in accordance with the grievance procedure established by this Article 23 and not in any other forum." [6]

B. *The May 10, 2002 Letter to John Hirschbeck*

On May 10, 2002, Ralph Nelson, Vice President of Umpiring for the Commissioner's Office, wrote to umpire John Hirschbeck, president of the WUA, concerning his conduct at two then recent games.[7] Nelson asserted that Hirschbeck

---

1. Manfred Decl. Ex. 1.

2. *Id.,* Art. 10.C.

3. *Id.,* Art. 10.F.1.

4. *Id.,* Art. 10.F.4.

5. *Id.,* Art. 23.A.

6. *Id.,* Art. 23.A.

7. *Id.,* Ex. 2.

signaled to the home plate umpire at an April 28, 2002 game not to issue a warning to a pitcher who nearly had hit a batter, that a retaliation pitch by the other team followed, and that Hirschbeck told his crew not to issue such warnings without his consent. Nelson charged that these actions violated the Official Playing Rules of Major League Baseball. He stated also that Hirschbeck's threat to his supervisor that he would issue needless warnings to pitchers in future games and instruct other umpires to do the same would have "serious repercussions" for Hirschbeck if carried out. Finally, Nelson stated that Hirschbeck's performance as home plate umpire during a May 4, 2002 game was "clearly not commensurate with [his] abilities" as reflected by data the Office of the Commissioner received from the QuesTec Umpire Information System, which showed a high percentage of missed calls of balls and strikes.

A WUA attorney responded to Nelson's letter on behalf of Hirschbeck on or about May 21, 2002.[8] The letter disputed nearly all of Nelson's allegations, requested copies of all information to which Nelson had access in assessing Hirschbeck's performance, and requested that all contractual deadlines marking appeal and/or grievance rights under the CBA be suspended.

The Union subsequently wrote to the Office of the Commissioner on May 29, 2002 to grieve formally, under Article 23, "the letter of May 10, 2002 and its entire contents."[9] Specifically, the Union challenged Nelson's interpretation or application of Official Playing Rule 8.02(d) con-

cerning "brush back" and retaliation pitches, Umpire Manual Part V regarding teamwork, Art. 9.E.5 of the CBA regarding protected speech of union officers, Art. 24 of the CBA regarding discrimination on the basis of union membership, and Article 7.C.1 of the CBA and the Umpires Manual concerning the use of new methods to assess the performance of umpires.

The Commissioner's Office responded by letter that the "sole avenue of redress" for the WUA and Hirschbeck concerning the May 10, 2002 letter was through Article 10, not Article 23.[10] After the Union referred the matter to arbitration under Article 23,[11] the Commissioner's Office brought this action for a declaratory judgment that the dispute is not arbitrable and a permanent injunction against the WUA proceeding with arbitration of its grievance.[12]

### Discussion

#### A. Summary Judgment Standard

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[13] A fact is material "if it might affect the outcome of the suit under the governing law," while an issue of fact is genuine "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[14]

The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences

---

8. *Id.*, Ex. 3.

9. *Id.*, Ex. 4.

10. *Id.*, Ex. 5.

11. *Id.*, Ex. 6.

12. Complaint ¶¶ 18–23.

13. *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (quoting Fed. R. Civ. P. 56(c)); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

14. *Giordano v. City of New York,* 274 F.3d 740, 746–47 (2d Cir.2001).

in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.' "[15]

B. *Interpretation of the Arbitration Clause*

 This dispute concerning the arbitrability of the WUA's purported grievance is governed by principles set forth by the Supreme Court in the *Steelworkers Trilogy*[16] and its progeny. Chief among these is that arbitration is a " 'matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' "[17] Furthermore, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."[18] Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."[19]

 These determinations are informed by the "strong federal policy favoring settlement of labor disputes through arbitration"[20]—"[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[21] Application of this presumption varies depending upon the breadth of an arbitration clause. Where a CBA contains the broadest of possible arbitration clauses, *i.e.*, one submitting to arbitration disputes "of any nature or character," or "any and all disputes," not merely disputes arising under the CBA, "all questions . . . will be properly consigned to the arbitrator."[22] "In dealing with a narrower arbitration clause, a court's inquiry is not so circumscribed, and it will be proper to consider whether the conduct in issue is on its face within the purview of the clause."[23]

In *Warrior & Gulf Navigation Co.*, the Supreme Court interpreted an arbitration clause inhabiting a middle ground between these two extremes. The clause at issue covered differences "as to the meaning and application of the provisions of this Agreement" and "any local trouble," but excepted from arbitration "matters which are strictly a function of management."[24] The Court found that it was improper for it to

---

15. *Allen*, 64 F.3d at 79 (citation omitted) (quoting *Lund's Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989)).

16. *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

17. *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. 1347).

18. *AT & T Technologies, Inc.*, 475 U.S. at 649, 106 S.Ct. 1415. *See also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

19. *AT & T Technologies, Inc.*, 475 U.S. at 649, 106 S.Ct. 1415.

20. *New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 84 (2d Cir.1991).

21. *Warrior & Gulf Navigation Co.*, 363 U.S. at 582, 80 S.Ct. 1347.

22. *Rochdale Village, Inc. v. Pub. Serv. Employees Union, Local No. 80*, 605 F.2d 1290, 1295 (2d Cir.1979).

23. *Id.*

24. *Warrior & Gulf Navigation Co.*, 363 U.S. at 576–77, 80 S.Ct. 1347.

decide what activities fell within the "vague" management exception, which would have required it to "become entangled in the construction of the substantive provisions of a labor agreement." [25] It held that, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." [26]

 Article 23 is best described as a narrow arbitration clause because it covers a limited universe of disputes—those involving the interpretation or application of the CBA and whether a "rule, policy, directive or instruction issued by the Office of the Commissioner . . . is inconsistent with the a provision of th[e] Agreement, the Official Playing Rules or the Manual." [27] Accordingly, this Court must determine whether this dispute falls within the arbitration clause, is expressly excluded from it, or if "forceful evidence of a purpose to exclude" it exists.

The first question is whether the May 10, 2002 letter constituted "discipline" for purposes of the CBA. The Court holds that it does. Although courts "should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting [an] arbitration clause," [28] the language of the exception set forth in Article 10 and further described in Article 23 is clear on its face. [29] Although Article 10 does not define explicitly the term "discipline," it sets forth examples of what constitutes discipline, including any "warning, fine, suspension or termination." [30] Mindful that "[w]e cannot close our eyes to the plain meaning of the words used," [31] this Court holds that the letter sent by Nelson to Hirschbeck was a warning, and therefore constituted "discipline" within the meaning of the CBA. [32]

This analysis is distinguishable from the "construction of the substantive provisions

25. *Id.* at 585, 80 S.Ct. 1347.

26. *Id.* at 584–85, 80 S.Ct. 1347.

27. Manfred Decl. Ex. 1, Art. 23.A.; *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988).

28. *Warrior & Gulf Navigation Co.*, 363 U.S. at 585, 80 S.Ct. 1347.

29. *See Woodcrest Nursing Home v. Local 144*, 788 F.2d 894, 898 (2d Cir.1986) (provision in CBA that "non-slotted" nursing home employees would not be subject to terms and benefits of agreement "unambiguously excludes arbitration of disputes with respect to . . . non-slotted employees."); *Gangemi v. Gen. Elec. Co.*, 532 F.2d 861, 868 (2d Cir. 1976) (holding that language "clearly and unambiguously provided for only voluntary or permissive arbitration of the dispute between the parties and that it was error for the district court to compel arbitration"); *Communications Workers of Am. v. New York Tel. Co.*, 327 F.2d 94, 95–96 (2d Cir.1964) (provision

in collective bargaining agreement providing that "[i]n no event shall any grievance or dispute arising out of this Section 9.08 be subject to the arbitration provisions of this Agreement" clear and unambiguous).

30. Manfred Decl. Ex. 1, Art. 10.D.1.

31. *Communications Workers of Am.*, 327 F.2d at 97 (finding dispute not arbitrable based on clear, direct exclusionary clause in collective bargaining agreement).

32. Specifically, Nelson's letter warned Hirschbeck that (1) his handling of a brush back pitch was "not in conformance with the Commissioner's Office policy," (2) any attempt by him to follow through on threats to issue needless warnings in future games and instruct other umpires to do the same "will result in serious repercussions," and (3) his poor performance in missing a number of calls of balls and strikes suggests that he did not perform to the best of his abilities, as is required of major league umpires. Manfred Decl. Ex. 2.

of a labor agreement" that the Supreme Court was unwilling to undertake in *Warrior & Gulf Navigation Co.*[33] Whereas the exclusion clause in *Warrior* was vague—it did not define what activities were "strictly a function of management"—the carve-out in this CBA is express.

The next question is whether the Union's grievance was confined to the May 10, 2002 warning letter, in which case the Union would be limited to the dispute resolution procedures in Article 10, or distinct from the disciplinary letter and thus subject to Article 23.

The WUA maintains that it is not grieving the May 10, 2002 letter specifically, but rather the policies reflected in the letter which, it contends, are " 'materially . . . inconsistent' " with the Basic Agreement, the Official Playing Rules and the Umpire Manual.[34] In support of this point, the Union notes that it "sought no relief for John Hirschbeck in or through the Grievance."[35]

The Commissioner's Office maintains that the WUA's grievance involves a challenge to the warning letter sent to Hirschbeck and thus is "undeniably subject to the Article 10 dispute resolution procedures and not the Article 23 grievance and arbitration procedures."[36] It points to defendant's language in its May 29, 2002 grievance letter invoking Article 23—"the World Umpires Union grieves the letter of May 10, 2002 and its entire contents"—as well as to the substance of the grievance.

Defendant's argument that the grievance it seeks to arbitrate is distinct from a challenge to "discipline," because it implicates the reasons relied upon by Nelson for issuing the warning letter to Hirschbeck, is unavailing. First, a dispute involving discipline often implicates the interpretation of the rules giving rise to the discipline.[37] In this case, the two necessarily are intertwined. For example, the Union's challenge to the application of Official Playing Rule 8.02(d) concerning "brush backs" and player ejections, and to the use of QuesTec to evaluate umpires, necessarily involves the particular application of these rules to Hirschbeck, which culminated in Nelson's warning letter.[38] Were the Court to permit the Union to arbitrate the reasons underlying Nelson's letter, the exception in Article 10 would be rendered toothless. An aggrieved party often could skirt the ban on arbitration of disputes involving discipline by arguing that the true nature of the dispute is not the discipline applied, but the interpretation of rules giving rise to the discipline. But this is not the bargain the CBA reflects.

The fact that the Union seeks no relief with respect to Hirschbeck is not dispositive. Article 10 states that it shall be the "sole and exclusive means available to an umpire (and to the Union) to *challenge* any decision by the Office of the Commissioner to discipline, or to terminate . . . the employment of, an umpire."[39] A challenge does not necessarily require a demand for relief—it simply may dispute the rationale

**33.** 363 U.S. at 585, 80 S.Ct. 1347.

**34.** Def. Reply Mem. 3.

**35.** Def. Mem. 16.

**36.** Pl. Mem. 11.

**37.** Of course, it is possible to challenge discipline without implicating the interpretation or application of the underlying rules. For example, a party might challenge the severity of his or her punishment without contesting that he or she violated a rule or policy.

**38.** *See, e.g., Gen. Drivers, Local Union No. 509 v. Ethyl Corp.*, 68 F.3d 80, 84 (4th Cir.1995) (where collective bargaining agreement excluded from arbitration clause "matters affecting wages and rates of pay," union may not arbitrate job promotion tests that are a *"sine qua non* of an employer's pay").

**39.** Manfred Decl. Ex. 1, Art. 10.C (emphasis added).

for the imposition of discipline. Furthermore, the Union's grievance falls squarely within the definition of excepted matters set forth in Article 23, or "disputes *involving* the discipline or termination ... of an umpire." [40] In consequence, the WUA's "grievance" falls squarely within Article 10.

The Court likewise is not persuaded by defendant's argument that denial of arbitrability would result in "the Commissioner ... hav[ing] unfettered discretion to shelter any action or policy which might otherwise violate the Basic Agreement, the Official Playing Rules or the Umpire Manual simply with a letter of 'discipline.' " [41] While Article 23.A does provide that certain matters involving a "rule, policy, directive or instruction issued by the Office of the Commissioner pursuant to Article 5.B" are subject to arbitration, the WUA's grievance does not challenge a "policy, directive or instruction" that was issued pursuant to Article 5.B, but rather challenges a disciplinary letter issued to an individual umpire for specific conduct. Article 5.B describes the *circumstances* in which the Commissioner's Office may "make or change rules, policies, directives and instructions for the conduct of its business and the management of *umpires.*" [42] Thus, by its express terms, Article 5.B contemplates rulemaking directed at all umpires, not a single individual. And while the Court is aware that Hirschbeck is not just any umpire, but president of the WUA, this does not change the fact that the May 10, 2002 letter was not a "rule, policy, directive or instruction" directed at umpires—it was a warning to Hirschbeck based on his individual actions.

Finally, this Court's conclusion that the Union's position concerning the arbitrability of the controversy as to the May 10,

2002 letter is incorrect does not mean that, in appropriate circumstances, the Union could not properly grieve issues related, for example, to Official Playing Rule 8.02(d), concerning "brush back" or retaliation pitches, or Art. 9.E.5 of the CBA, regarding protected speech of union officers. If a disagreement concerning the interpretation or application of Art. 9.E.5 arose outside of the context of discipline of an umpire, the Union could grieve the issue pursuant to Article 23. Likewise, if the Commissioner's Office issued a "rule, policy, directive or instruction ... pursuant to Article 5.B" of the CBA that the Union alleged was inconsistent with the Official Playing Rules, the Union could grieve the matter pursuant to Article 23. When, however, any such issues arise in the context of discipline of an umpire, dispute resolution procedures are limited to Article 10 by the clear language of the CBA.

As the Court concludes that the May 10, 2002 warning letter constituted "discipline" for purposes of the CBA and that the Union's complaint concerns the warning letter, the WUA may not arbitrate the instant dispute under Article 23.

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted. Defendant's cross-motion for summary judgment on Count Two of its counterclaims is granted to the extent that the Court in due course will enter judgment declaring the rights of the parties as indicated herein and otherwise denied.

SO ORDERED.

---

**40.** *Id.*, Art. 23.A (emphasis added).

**41.** Def. Mem. 18.

**42.** Manfred Decl. Ex. 1, Art. 5.B.1 (emphasis added).