Jean COVELLO, Plaintiff,

v.

**DEPOSITORY TRUST COMPANY, and Local 153, Office and Professional Employees International Union AFL–CIO, Defendants.**

No. 99 CV 337(ADS).

United States District Court,
E.D. New York.

Aug. 13, 2002.

Jean Covello, Branford, CT, Plaintiff Pro Se.

Proskauer Rose, LLP by Frederic C. Leffler, Esq., Marc A. Mandelman, Esq., New York City, for the Defendant Depository Trust Company.

Lilly & Associates, LLP by Thomas J. Lilly, Jr., Esq., Garden City, NY, for the Defendant Local 153, Office & Professional Employees International Union, AFL–CIO.

## AMENDED MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On July 21, 1999, Jean Covello ("Covello" or the "plaintiff") filed an amended complaint in which she alleges that the Depository Trust Company ("Depository Trust" or a "defendant"), her former employer, discriminated against her on the basis of a disability in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* ("ADA"). The amended complaint also contends that Local 153, Office and Professional Employees International Union, AFL–CIO ("Local 153" or a "defendant") breached the duty of fair representation owed to her pursuant to Section 301 of the Labor Management Relation Act of 1947 ("LMRA"), 29 U.S.C. § 185. Presently before the Court are two motions for summary judgment, one filed by the Depository Trust and the other by Local 153.

## I. BACKGROUND

### A. As to the Claims Against Depository Trust

The following facts are undisputed unless otherwise indicated. Depository Trust is a large securities depository that acts as a national clearinghouse and as a custodian of over $20 trillion of securities for its participant banks and broker-dealers. Depository Trust has a main office in New York, New York, and a satellite office in Garden City, New York. At the Garden City location, the company maintains a Registered Vault in which securities are processed and stored.

Covello worked for Depository Trust from October 1987 until May 1998, during which time she worked in the Garden City office. Throughout her employment Covello was a member of Local 153. Accordingly, the terms and conditions of her employment were governed by a collective bargaining agreement ("CBA") between Depository Trust and Local 153.

In January 1987, prior to her employment by Depository Trust, the plaintiff fractured her left ankle and required "open reduction and internal fixation surgery," which means that metal hardware was inserted into her leg to stabilize her ankle.

The plaintiff began working for Depository Trust on or about October 17, 1987. Before she started this job, Covello submitted to a physical examination, which was a condition of her employment. The person who completed the examination form wrote that the plaintiff had "hard-

ware" in her left ankle and scars on the same ankle. In boxes next to the words, "lower extremities: feet toes" and "scars" the person who completed the examination form wrote the number, "1", which is a code for "abnormal." The other codes that could have been used were: "O" for "within normal limits" and "X" for "not examined." In a medical history form that Covello completed on September 24, 1987, she indicated that she had surgery in January 1987.

From 1987 until 1990, Covello worked as a Clerk in the Clipping Department of the Bearer Vault. In this position, she removed coupons from bearer bonds and prepared them for further processing.

From 1990 to 1992, Covello worked as an Intermediate Clerk in the Verification Department of the Bearer Vault. Her responsibilities included receiving bearer coupons from the coupon clipping department; proofreading the coupons and envelopes; counting the coupons; calculating the dollar values; and preparing the mutilated coupons for letters of indemnity.

In January 1991, Covello had a second surgery on her ankle, during which the metal hardware was removed. She was permitted a paid leave of absence, and returned to work approximately six weeks after the surgery.

From 1992 through the summer of 1997, Covello worked in the Expediting Department of the Registered Vault as an Intermediate Clerk. During this time, her responsibilities included answering telephone calls from banks and brokerage houses; requesting inventory from the Philadelphia Depository; monitoring vault reports; completing paperwork; performing various recordkeeping tasks; and comparing certificates and transactions.

In the summer of 1997, Covello's position as an Intermediate Clerk in the Expediting Department was phased out due to the merger of Depository Trust and the Philadelphia Depository. Meanwhile, a person who was working as a Certificate on Demand ("COD") Clerk transferred to the New York City office. Therefore, on July 31, 1997, Eugenia Smith ("Smith"), Covello's supervisor, informed the plaintiff that she would be transferred to the position of COD Clerk, which was a job within the Expediting Department.

The principal functions of a COD Clerk are research; microfilming securities; preparing route slips; keeping logs; stamping certificates with endorsements; and using the computer. Of these responsibilities, the primary one is research. When a brokerage house or bank calls to request securities certificates, the COD Clerk locates the securities within the Registered Vault. The vault contains millions of securities certificates that are stored in open-shelved wall units that rise fourteen feet into the air. The COD Clerk retreives the securities certificates from the higher shelves by using platform staircase ladders. The Depository Trust maintains that the staircase ladders are approximately eight feet high, have deep steps, secure handrails, locking wheels, and a platform on their top level. Covello states that some of the ladders are broken, have bent frames, and have been taped. She also comments that COD Clerks climb ladders constantly.

Between 1995 and 1997, Covello occasionally performed the tasks of a COD Clerk when their workload was heavy. On these occasions, she used the staircase ladders without an incident. She never stated that she was unable to perform the research function of the job due to her ankle.

Because Covello had periodically acted as a COD Clerk, Smith, her supervisor, believed the new position would be a natural progression for Covello. Between August 1997 and November 10, 1997, Covello performed the tasks required by her new

position without complaining to her supervisors at Depository Trust. She never gave Smith any indication that she was suffering from an ankle condition that limited her physical abilities. However, in papers she submitted to the Court, Covello states that she began experiencing extreme pain in her left ankle in the summer of 1997.

In a note dated August 28, 1997, Dr. Harcharan K. Bhatia wrote that the plaintiff "is under my medical care and has been advised not to climb stairs or ladders." In a note dated October 9, 1997, Dr. Harvey Levine, an orthopedist wrote that Covello is "unable to climb at work because of degenerative arthritis in the left ankle 5 years after surgery for fracture."

From September 1997 to November 1997, Covello asked the Human Resources Administrator for assistance in obtaining a transfer to a different position in the Garden City office. There were no vacant available positions for which Covello was qualified. There may have been vacancies in the New York City office, but Covello did not want to commute to Manhattan. Covello also asked Smith to transfer her to another position, but Smith did not assist her.

Smith believed that Covello's performance as a COD Clerk was not satisfactory during the period from August 1997 to November 1997. On two occasions in October 1997, Smith spoke with Covello about the quality of her work. Smith focused on Covello's failure to follow-up on assignments, failure to communicate the status of her work, and failure to prioritize her tasks. During these discussions, Covello never mentioned that her performance was affected by a physical condition or limitation.

In November 1997, the plaintiff was still experiencing severe pain in her left ankle. She testified at her deposition that, "The longer I stood on my feet the more painful

it was. And it caused me to be a little bit slower in walking." Covello met with Deirdre O'Connell in Human Resources, who gave her a Family Medical Leave Act certification form which was completed by Dr. Levine. On November 3, 1997, Dr. Levine wrote that Covello suffered from "Degenerative arthritis of the left ankle. Patient experiences severe exacerbation of symptoms upon excessive ambulation and climbing stairs, climbing ladders should strongly be avoided." Dr. Levine also wrote that Covello's condition commenced several years earlier and had an indefinite duration. Dr. Levine stated that Covello "is advised not to climb ladders at work." He did not write anything in the section on the form that allows doctors to set forth the patient's treatment program.

In a written annual performance evaluation given to Covello on November 6, 1997, Smith gave Covello an overall rating of "Needs Improvement." This was Covello's first unfavorable review during her ten years with Depository Trust, and on the same day, November 6, 1997, Covello submitted a four-page rebuttal to it. In the rebuttal, Covello explains her inability to meet performance standards by stating that "my two co-workers have been in the COD area longer then I have been"; "I am trying to learn as much as I can within the short time I have been doing COD's"; "I am trying not to make any errors"; "I feel I am trying to do the best I can under sometimes difficult circumstances"; "due to the unreasonable production sheet, which I feel needs to be simplified, I may not be given credit for everything I do"; "I have never been the cause of any failed delivery"; "I feel I do not have a good working relationship with ... Smith, who at times is unapproachable"; and "I feel that Genie Smith sometimes lets her personal feelings take over and cannot give a fair evaluation". Covello's November 6, 1997 rebuttal does not mention that she

was unable to perform the climbing function of her job due to an ankle injury.

On November 7, 1997, Covello submitted the August 28, 1997 and October 9, 1997 notes from Dr. Bhatian and Dr. Levine to an unidentified individual at Depository Trust.

On November 10, 1997, Smith and one Patrick O'Donnell ("O'Donnell"), a manager and Smith's superior, met with Covello to discuss her evaluation. O'Donnell said that Covello's rebuttal demonstrated that she was still learning the new responsibilities of her job. Therefore, he offered to set aside the poor performance evaluation and to re-evaluate her in six months, so she would have more time to learn the skills associated with her new job.

Covello responded to O'Donnell's offer by stating that she could not perform her job because it involved a great deal of climbing on the staircase ladders, and her doctors had advised her not to do any climbing at work. Covello also handed O'Donnell the Family and Medical Leave Act form prepared by Dr. Levine, as well as the two notes from her doctors. O'Donnell informed Covello that although there were no available positions in Garden City, the New York City office might have vacancies. O'Donnell then adjourned the meeting. Prior to this meeting, neither Smith nor O'Donnell was aware that Covello had problems with her left ankle that prevented her from climbing ladders at work.

O'Donnell consulted Depository Trust's labor relations department about Covello's medical condition and was advised to place her on a medical leave of absence. Smith informed Covello that since she could not perform her job, she must go home until her doctors told her she could do her job or another situation could be worked out.

Pursuant to the terms of the collective bargaining agreement, Covello was paid during her leave of absence. She also received all of the benefits she would have received had she continued to work, including her 1997 year-end bonus. In addition, her position was left open so that she could return to work if she obtained medical clearance.

The collective bargaining agreement also provides that any employee who is on medical leave for more than six months, and who is not receiving benefits pursuant to Depository Trust's long-term disability benefit policy, will be terminated. On April 15, 1998, Depository Trust provided Covello with the long-term disability forms, and advised her that in order for her to remain out of work beyond the six-month shortterm disability leave, she had to qualify for long-term disability benefits. Covello was also informed that if she did not qualify for long-term disability benefits, she had to return to work on May 11, 1998.

Covello did not return to work, reply to Depository Trust's correspondence, or request an extension of her medical leave period. In addition, Covello did not apply for long-term disability benefits because she did not view herself as being sick or disabled. She testified that her doctor did not want to complete the long-term disability benefits forms because the plaintiff's surgery was not recent.

On or about May 12, 1998, Covello received a letter from one Charles Smith terminating her employment at Depository Trust pursuant to the leave policy in the collective bargaining agreement.

Covello experiences constant pain in her left ankle which causes her to walk more slowly. Covello states that her "balance is not the same", and when she stands for long periods of time, she becomes exhausted. She becomes very tired when she walks on her ankle all day.

With the exception of her ankle problem, Covello feels that she is in relatively good health. She is physically able to climb stairs and lives on the third floor of a three-story walk-up. However, she rests every four or five steps and tries to make only one trip per day because it is exhausting. She is also able to climb the staircase ladders at Depository Trust at her own pace. Covello takes care of herself; feeds herself; clothes herself; washes herself; is able to see, hear, and learn; makes a living, performs manual tasks; shops for groceries and clothing by herself and without the aid of a wheelchair; walks; writes letters; organizes documents; speaks on the telephone; files and keeps records; makes and keeps notes; does her laundry; takes out her garbage; cleans her house; and goes on vacation (Affidavit of Fredric C. Leffler, Exhibit A, Covello's Deposition Transcript, pp. 15–16).

From 1992 to 1997, Covello did not visit a doctor or seek physical therapy for her ankle. In addition, from October 9, 1997, the date of her visit to Dr. Levine until December 15, 2000, the date of her deposition, Covello did not visit a doctor with regard to her ankle.

From 1994 until 1997, Covello also worked at a CVS on the weekends. She stocked the greeting card shelves and performed most of her work while sitting at a table. In 1998 and again in 1999, the plaintiff worked for the Board of Elections in Nassau County on election day. She recorded the names of the voters and verified their addresses. Beginning in June 2000, Covello has been employed as a part-time office assistant for Gillete Auto Body. Her responsibilities include various clerical tasks. She still held this position as of the December 15, 2000, the date of her deposition.

On January 5, 1998, Covello filed a charge with the Equal Employment Opportunity Commission ("EEOC"), and on October 31, 1998, she received a right-to-sue letter.

### B. As to the Claims Against Local 153

Covello pursued a grievance against Depository Trust through Local 153. The CBA outlines a four-step grievance procedure, the third step of which requires the Union to file with the Director of Labor Relations "[a] written statement of the grievance setting forth the particular clause or provision of the Agreement involved ... within eight (8) full business days after the conclusion of Step 2, but in any event within 25 full business days of the occurrence of the incident or event giving rise to the grievance, by an officer of the Union with the Director of Labor Relations." The CBA further provides that "[t]he failure of the party asserting a grievance to follow this grievance machinery, to file a statement of the grievance ... within the times specified above, shall, unless consented to in writing by the other party, be deemed an abandonment of the grievance."

The Union failed to file a Step 3 written statement of grievance, and the matter was submitted to an arbitrator. On May 10, 1999, the arbitrator held a hearing on the issue of whether the Union's failure to file a written statement of grievance rendered Covello's grievance non-arbitrable under the terms of the CBA. In an opinion and award dated May 12, 1999, the arbitrator held that it did and dismissed Covello's grievance on the basis of this procedural defect.

Covello does not believe that any of the Local 153 representatives who helped process her grievance bore any ill will or animosity against her. Covello also would not have brought this lawsuit against Local 153 if the arbitrator had not dismissed her

grievance for the Union's failure to file the written statement of grievance.

### C. The Causes of Action

The Court interprets Covello's amended complaint as raising three causes of action. Covello's first and second causes of action allege that Depository Trust violated her rights under the ADA by failing to provide her with a reasonable accommodation; and terminating her employment, both on the basis of her disability. The third cause of action alleges that Local 153 breached the duty of fair representation it owed to Covello by failing to file a written statement of grievance as required by Step 3 of the grievance procedures outlined in the CBA.

## II. *DISCUSSION*

### A. Rule 56.2 Statement

A district court cannot grant a motion for summary judgment in a case involving a *pro se* litigant unless (1) the court apprises the *pro se* litigant of the consequences of failing to respond to the motion, *see Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir.1994); (2) an opposing party has already provided the litigant with the requisite notice, *see Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996); or (3) it is clear that the litigant understands "the nature and consequences of summary judgment", *see M.B. # 11072–054 v. Reish*, 119 F.3d 230, 232 (2d Cir. 1997). *See Vital v. Interfaith Medical Center*, 168 F.3d 615, 620–21 (2d Cir.1999) (holding that the failure of the district court to apprise a *pro se* litigant of the consequences of failing to respond to a motion for summary judgment is a ground for reversal). To fulfill this duty, the United States District Courts for the Eastern and Southern Districts of New York adopted Local Rule 56.2 on September 23, 1999. *See* E.D.N.Y. Administrative Order 99–6 (citing *Vital*, 168 F.3d 615). Local Rule 56.2 provides, in relevant part:

Any represented party moving for summary judgment against a party proceeding *pro se* shall serve and file as a separate document, together with the papers in support of the motion, a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" in the form indicated below.

The notice referred to in the rule advises the *pro se* litigant of the possibility that the complaint may be dismissed and informs the litigant that he or she must submit evidence countering the facts asserted by the defendant and raising issues of fact for trial. Thus, the focus of both *Vital* and Local Rule 56.2 is that the *pro se* litigant understands "the consequences of failing to respond to a motion for summary judgment" and receives notice that "he must file his own affidavits contradicting his opponent's if he wants to preserve factual issues for trial." *Vital*, 168 F.3d at 621.

When Depository Trust filed and served its original motion for summary judgment on December 19, 2000, Local Rule 56.2 was in effect. Depository Trust did not file a Rule 56.2 Statement with the Court, as is required by Rule 56.2. However, in his affidavit in support of Depository Trust's motion for summary judgment, counsel for Depository Trust states, "I have served Plaintiff *pro se* with a copy of the notice required pursuant to Local Rule 56.2 under separate cover." In addition, the motion for summary judgment that was filed by Local 153 on December 18, 2000 contains a Rule 56.2 Statement that fully complies with Local Rule 56.2. In particular, the notice informs Covello that her claims may be dismissed if she does not respond to the motion and states that she must submit evidence countering the facts asserted by the defendant and raising issues of fact for trial. In addition, the notice advises, "If you do not respond

to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by the defendant, the court may accept defendant's factual assertions as true. Judgment may then be entered in defendant's favor without a trial."

Although Depository Trust should have filed its own Rule 56.2 Statement with the Court, the Court is persuaded that Covello received notice of the consequences of failing to respond to Depository Trust's motion and of the requirement that she file her own affidavits contradicting the those of the defendants if she wants to preserve factual issues for trial. *Vital,* 168 F.3d at 621. First, counsel for Depository Trust has sworn that he served Covello with a copy of the Rule 56.2 statement.

Second, the statement filed by Local 153 serves to satisfy the obligation of both defendants. The original notices of motion submitted by the two defendants bear the same date, December 15, 2000. The original motion by Depository Trust was filed one day after Local 153 filed its motion for summary judgment. In addition, when the parties refiled their motions, they did so within one day of each other. Therefore, with reasonable certainty, on or about the date that Covello received Local 153's Rule 56.2 Statement, she received the motion by Depository Trust for summary judgment.

Third, it is evident from the plaintiff's opposition papers that she understood that she is required to deny factual allegations and cite to the record to support those denials. Covello submitted two three-ring binders full of papers in opposition to the two respective motions for summary judgment. Following each of her factual allegations, Covello refers to a numbered document that she has included in the three-ring binder. Included among those documents are pages from her deposition testimony and doctors notes. Under these circumstances, it is clear that the plaintiff

received sufficient notice of the consequences and requirements of summary judgment so that Depository Trust's failure to comply with Rule 56.2 can and will be excused. *See Sawyer v. American Fed'n of Gov't Employees,* 180 F.3d 31, 35 (2d Cir.1999) (emphasizing that *"Vital* should not be understood ... to set down an unyielding rule prohibiting district courts from acting on motions for summary judgment sought against *pro se* litigants in the absence of explanatory notice" and that "the issue [is] whether from all the circumstances, including the papers filed by the *pro se* litigant, it is reasonably apparent that the litigant understood the nature of the adversary's summary judgment motion and the consequences of not properly opposing it").

## B. The Summary Judgment Standard

Summary judgment must "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Put differently, summary judgment is required "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the party moving for summary judgment to establish the absence of any genuine issues of material fact, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), and any ambiguities must be resolved in favor of the non-movant, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986). "When the movant demonstrates through competent evidence

that no material facts are genuinely in dispute, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56(e)). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Id.* (internal quotation marks and citations omitted).

The existence of disputed facts that are not material to the issues at hand may not defeat summary judgment. *Id.* The substantive law identifies which facts are material. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Id.* If there is evidence in the record, including affidavits, exhibits, interrogatory answers, and depositions, as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Lane v. New York State Electric & Gas Corp.*, 18 F.3d 172, 176 (2d Cir.1994); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991).

"[T]he trial court's task at the summary judgment motion stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to decid[e] them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

In making this determination, the Court is mindful that Covello's *pro se* status means that her submissions should be held "'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir.1998) (citations omitted). The Court recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit rights by virtue of her lack of legal training. *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir.1983). Indeed, courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, the Court is also aware that *pro se* status "'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Traguth*, 710 F.2d at 95 (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir.1981)).

## C. The Americans With Disabilities Act

The ADA prohibits a covered employer from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir.1998) (citing *Wernick v. Federal Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir.1996)). In order to establish a prima facie case of discriminatory discharge, a plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability with-

in the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was discharged because of his disability. *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001); *Ryan*, 135 F.3d at 869–70.

In addition, a plaintiff can state a claim for discrimination based upon his employer's failure to accommodate his disability by alleging facts showing that (1) his employer is subject to the ADA; (2) he is an individual with a disability within the meaning of the ADA; (3) with or without reasonable accommodation, he could perform the essential functions of the job; and (4) the employer had notice of the plaintiff's disability and failed to provide such accommodation. *See Lyons v. Legal Aid Society*, 68 F.3d 1512, 1515 (2d Cir. 1995).

Under either theory—discriminatory discharge or failure to make a reasonable accommodation—the first issue before this Court is whether Covello is disabled within the meaning of the ADA. The ADA defines a "disability" as either "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Reading the complaint and opposition papers "liberally and interpret[ing] them to raise the strongest arguments they suggest," *McPherson*, 174 F.3d at 280 (quotations omitted), the Court finds that Covello claims that she is disabled under the first and second definitions of disability, and the Court will consider each of them in turn.

## 1. Physical Impairment that Substantially Limits A Major Life Activity

The Supreme Court has articulated a three-step process for evaluating a claim of "disability" as defined under 42 U.S.C. § 12102(2)(A). *See Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the Court must determine whether the plaintiff suffers from a physical or mental impairment. Second, the Court must identify the life activity the plaintiff claims is limited by his impairment and must determine whether that life activity is "major." Third, the Court considers whether the impairment substantially limits the major life activity. *Id.*

■ The EEOC regulations that implement the ADA define an "impairment" to include any "physiological disorder, or condition" that affects *inter alia* the neurological, musculoskeletal, cardiovascular, respiratory, reproductive, digestive, and endocrine systems or the special sense organs. 29 C.F.R. § 1630.2(h)(1). The degenerative arthritis of Covello's left ankle, which is mentioned in the two doctors' notes and the Family Medical Leave Act form, is a condition that affects her musculoskeletal system. As such, the Court concludes that Covello's claimed condition is a physical "impairment" as that term is defined in the ADA.

■ Reading Covello's papers liberally, the Court determines that Covello is claiming that her arthritic ankle substantially limits her ability to work, to walk, and to stand. Although the ADA does not define major life activities, the Supreme Court has recently held that the phrase "refer[s] to those activities that are of central importance to daily life." *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, ——, 122 S.Ct. 681, 692–93, 151 L.Ed.2d 615 (2002). In addition, the EEOC regulations provide that "major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). This list is representative, nor exhaustive. *See Brag-*

*don,* 524 U.S. at 638–39, 118 S.Ct. at 2205. Indeed the second Circuit has identified other "major life activities," including, but not limited to "sitting, standing, lifting, or reaching." *Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 641 (2d Cir.1998).

Notably, the Supreme Court has not decided the issue of whether working is a major life activity and recently reiterated earlier skepticism that working could be considered as such. *See Toyota,* 122 S.Ct. at 692–93 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as such, and we need not decide this difficult question today."); *see Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999) ("[T]here may be conceptual difficulty in defining 'major life activities' to include work, for it seems to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.") (quotations omitted). Nevertheless, in several post-*Sutton* opinions, the Second circuit has continued to treat work as a major life activity. *See Giordano,* 274 F.3d at 747–48; *Heyman v. Queens Village Comm. for Mental Health,* 198 F.3d 68, 72–73 (2d Cir.1999); *Muller v. Costello,* 187 F.3d 298, 312, 312 n. 5 (2d Cir.1999). Accordingly, this court assumes, but does not decide, that work is a major life activity. Therefore, the Court finds that Covello has identified three major life activities, working, walking, and standing, which she claims her physical impairment substantially limits.

The EEOC regulations define the word "substantially" in the phrase "substantially limits" to mean "unable to perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity." 29 C.F.R. § 1630.2(j)(1). The Supreme Court recently held that "substantially" suggests "considerable or to a large degree." *Toyota,* 122 S.Ct. at 691. The Court also held that "[t]he word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Toyota,* 122 S.Ct. at 691 (internal citations omitted). Therefore, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Id.* (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii). To prove disability under this test, an individual must do more than "merely submit evidence of a medical diagnosis of an impairment.") *Toyota,* 122 S.Ct. at 691. Rather, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial.'" *Toyota,* 122 S.Ct. at 691–92 (quoting *Albertson's Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)).

Covello's claim that her degenerative arthritis substantially limits her ability to walk and stand is without merit. She raises this claim for the first time in her opposition papers to Depository Trust's motion for summary judgment, which is not the proper place to amend a complaint. Moreover, Covello's assertion consists of a single sentence: "The plaintiff is covered by the ADA because she has a physical impairment that substantially limits her ability to walk and stand." This claim is unsupported by a single piece of evidentiary support. The plaintiff herself testified to the contrary in her deposition, when she

stated that she could, among other things, walk, climb ladders, make a living, perform manual tasks, do the laundry, take out the garbage, and clean her home. Further, the doctors notes and medical records that Covello submitted in support of her opposition papers nowhere mention her ability to walk or stand much less indicate that she is prevented or severely restricted in performing either of these activities. Thus, the Court holds that based on Covello's unsupported assertion made for the first time in her opposition papers, no reasonable juror could find that Covello's ability to walk or stand is substantially limited.

The Supreme Court has held that in the context of the major life activity of working, the phrase " 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491, 119 S.Ct. at 2151. Similarly, the EEOC defines "substantially limits" in the context of the major life activity of "working" as "significantly restricted in the ability to perform either a class of. jobs or a broad range of jobs in various classes.... The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.". 29 C.F.R. § 1630.2(j)(3)(i); *see Giordano*, 274 F.3d at 747. A plaintiff who is substantially limited in the major life activity of working is one who is "precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton*, 527 U.S. at 492, 119 S.Ct. at 2151; *see Giordano*, 274 F.3d at 748.

This Court's inquiry must focus on whether the plaintiff "is unable to perform the variety of tasks central to most people's daily lives, not whether the [plaintiff] is unable to perform the tasks associated with her specific job." *Toyota*, 122 S.Ct. at 693. Any other analysis would render meaningless the Supreme Court's ruling in *Sutton*, 527 U.S. at 492, 119 S.Ct. at 2151, that a plaintiff must show that she is precluded from a broad range jobs, "because an inability to perform a specific job always can be recast as an inability to perform a 'class' of tasks associated with that specific job." *Toyota*, 122 S.Ct. at 693. In engaging in this inquiry, the Court is mindful that "the manual tasks unique to any particular job are not necessarily important parts of most people's lives." *Id.*

Applying this framework to the facts of this case, the Court concludes that Covello has failed to demonstrate that she was substantially limited in her ability to work. Assuming the truth of Covello's claim that she cannot repeatedly climb ladders, her impairment prevents her only from working as a COD Clerk or in other jobs for which repetitive and fast ladder climbing is an essential function. Covello can see, hear, and speak. She can walk and stand, though not for long periods of time. She can even climb stairs and ladders, but not repeatedly. In addition, Covello can care for herself: she can dress and feed herself. She also performs household chores, including grocery shopping, taking out the garbage, cleaning the house, and laundering her clothes. Covello can also write, answer and speak on the telephone, take notes, keep records, file records, and organize documents.

Clearly, the degenerative arthritis in Covello's left ankle does not render her "unable to perform the variety of tasks central to most people's daily lives." *Toyota*, 122 S.Ct. at 693. The impairment simply renders her unable to perform a single task integral to her specific job. *See id.* Re-

peatedly climbing ladder staircases is a manual task unique to Covello's particular job, not an important part of most people's daily lives. *See id.* Moreover, the manual tasks that Covello is able to perform even with her impairment make her eligible for, not precluded from, a substantial number of jobs. *See id.* Many jobs utilize the writing, telephone, filing, organizing, note-taking, and record-keeping skills Covello still has. Indeed, by claiming that Depository Trust should have assigned her to a position that did not involve climbing ladders, Covello seriously undercuts her argument that her ability to work is substantially limited. *See Scarborough v. Natsios,* 190 F.Supp.2d 5, 22 (D.D.C.2002). Accordingly, under the standards set forth by the Supreme Court in *Toyota* and *Sutton* Covello's impairment does not preclude her from performing a substantial class or broad range of jobs. *See Toyota,* 122 S.Ct. at 693; *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139. As such, the Court finds that, as a matter of law, Covello is not disabled under 42 U.S.C. § 12102(2)(A).

**2. A Record of Such Impairment**

█ Even if a plaintiff has failed to allege that his impairment substantially limits a major life activity, he may still qualify as disabled if he can provide a record of such impairment. *See* 42 U.S.C. § 12102(2)(B). According to the EEOC:

This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.

29 C.F.R. pt. 1630, App. Records that could potentially contain this information include education, medical or employment records. *Id.* However, "[t]he record must be one that shows an impairment that satisfies the ADA; a record reflecting a

plaintiff's classification as disabled for other purposes or under other standards is not enough." *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2d Cir. 1998).

Covello argues that her "record of impairment" consists of (1) the form completed by a doctor following the physical examination that was conducted prior to and as a condition of her employment at Depository Trust; (2) the medical history form that Covello completed on September 24, 1987 indicating that she had ankle surgery in January 1987; (3) the documents submitted to Depository Trust that enabled Covello to receive a six-week paid leave of absence following her January 1991 surgery; (4) the August 28, 1997 note of Dr. Bhatia; (5) the October 9, 1987 note of Dr. Levine; and (6) the Family Medical Leave Act form completed by Dr. Levine on November 3, 1997.

Reading these documents together and viewing them in the light most favorable to the plaintiff, the Court finds that the records do not show a history of a substantially limiting impairment. Instead, they demonstrate that Covello broke her ankle in 1987 and required surgery that involved inserting hardware into her ankle and that resulted in scarring. The records also establish that in 1991, Covello had a second surgery to remove the hardware, which procedure required her to take a six-week leave of absence from work. The 1997 doctors notes and Family Medical Leave Act form demonstrate that Covello suffers from degenerative arthritis in her left ankle, is unable to climb ladders, and should avoid climbing both stairs and ladders. The records do not describe an impairment that involves a greater degree of limitation of Covello's ability to work than the impairment described in the amended complaint. Therefore, Covello's claim based on a record of impairment fails for the

same reasons stated by the Court as to her claim of disability based on the substantial limitation of a major life activity. *See Colwell*, 158 F.3d at 645.

Because the Court has found that Covello is not disabled under either Section 12102(2)(A) or (B), as a matter of law, the motion by Depository Trust for judgment as a matter of law is granted, and the first and second causes of action are dismissed.

### D. The LMRA

■ Covello's third cause of action alleges that Local 153 violated the LMRA by breaching its duty to fairly represent her in the grievance procedure brought against Depository Trust. In particular, Covello argues that the failure by Local 153 to file a written statement of grievance pursuant to Step 3 of the grievance procedure outlined in the CBA resulted in the dismissal of her grievance against Depository Trust.

Local 153 concedes that it did not file a written statement of grievance and that their failure resulted in the dismissal of Covello's grievance. However, Local 153 argues that this conduct amounts to mere negligence, which it asserts is an insufficient basis for the plaintiff's claim. Local 153 states that it had a good faith belief that it was not required to file a Step 3 written statement of grievance because at a January 7, 1998 meeting with Depository Trust, the company's representative agreed that Covello's grievance would proceed to arbitration. The · Union argues that, therefore, its failure to file the Step 3 written statement of grievance was mere negligence which does not amount to a breach of the duty of fair representation.

In support of their argument, Local 153 offers the following evidence: (1) the arbitrator's written opinion and award, dated May 12, 1999; and (2) Covello's deposition testimony. The arbitrator's opinion describes the testimony of one Mike Thompson ("Thompson") Local 153's Senior Business Representative at the March 10, 1999 hearing. The ·opinion ·states that: (1) Thompson could not remember many important details regarding the January 7, 1998 meeting but did recall that the Depository Trust representative had not mentioned a procedural problem in regard to Covello's grievance; (2) Thompson stated that the Step 3 statements were merely pro forma and their absence did not preclude an employee from arbitrating her claim; and (3) Local 153 did not request Depository Trust's written consent to waive a timely Step 3 submission because Thompson did not believe the waiver was necessary.

In an attempt to authenticate Thompson's hearing testimony for the purpose of this motion, Local 153 offers the following questions and answers from Covello's deposition:

Q.  Starting on page 3, going over to page 4, there's a paragraph where the arbitrator summarizes Mr. Thompson's testimony at the hearing. If you would read that paragraph, please starting on page 3 and ending in the middle of page 4. Tell me if there's anything in there that's incorrect as far as what Mr. Thompson's testimony actually was?

A.  To the best of my knowledge it's correct. . . .

\*        \*        \*        \*        \*        \*

Q.  This is a summary of his testimony?

A.  Yes.

Q.  Is there anything in this recounting by the arbitrator that you would read and say, no, that's not what Thompson testified about, that's wrong?

A.  No. I would say that's an overall correct view.

The Court finds that this evidence is insufficient to support a finding that Local 153 is entitled to judgment as a matter of law. Furthermore, even if this evidence

were sufficient proof of the Union's assertions, nevertheless, a reasonable jury could conclude that Local 153 breached its duty of fair representation. A breach of the duty requires proof of conduct that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). However, "arbitrary conduct amounting to a breach is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, 'may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" *NLRB v. Local 282, Int'l Bd. of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) (quoting *Robesky v. Qantas Airways, Ltd.,* 573 F.2d 1082, 1090 (9th Cir.1978)); *see Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers,* 34 F.3d 1148, 1153 (2d Cir.1994). A reasonable jury could conclude, based on the evidence that Local 153 submitted in support of its motion, that Local 153 affirmatively chose not to file a Step 3 written statement of grievance when the terms of the CBA unambiguously require it and, thus, acted in an arbitrary manner as that term is defined in *Local 282,* 740 F.2d at 147. Accordingly, the Court finds that a genuine issue of material fact exists, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (holding that a genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party"), and the motion by Local 153 for judgment as a matter of law is therefore denied.

## III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED**, that the motion by Depository Trust for judgment as a matter of law is **GRANTED**, and the action as against Depository Trust is **DISMISSED**; and it is further

**ORDERED**, that the motion by Local 153 for judgment as a matter of law is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court is directed to amend the caption of this case to read as follows:

**ORDERED**, that Covello and Local 153 are directed to appear before this Court on September 17, 2002 at 9:00 a.m. to select a jury.

**SO ORDERED.**