Lorraine **LONGMOOR**, and Lyndsey Keene, plaintiffs,

v.

Karl **NILSEN**, Michael Fox, Town of Barkhamsted, Barkhamsted Inland Wetlands Commission, Trooper David Laboy, Trooper Hazen, Trooper Sweeney, and Lt. Tolomeo, Defendants.

No. 3:02CV1595(JBA).

United States District Court, D. Connecticut.

July 23, 2004.

See, also, 312 F.Supp.2d 352.

---

John R. Williams, Katrena K. Engstrom, Williams & Pattis, New Haven, CT, for Plaintiffs.

James Newhall Tallberg, Updike, Kelly & Spellacy, P.C., Stephen Richard Sarnoski, Attorney General's Office, Jason J. Vicente, Wendy Kennedy Venoit, Pepe & Hazard, Hartford, CT, for Defendants.

**Ruling on Motion for Summary Judgment of Defendants Trooper Laboy, Trooper Hazen, Trooper Sweeney, and LT. Tolomeo [Doc. # 67]**

ARTERTON, District Judge.

Defendants Laboy, Hazen, Sweeney, and Tolomeo move pursuant to Fed.R.Civ.P. 56 for summary judgment on plaintiff Lorraine Longmoor's 42 U.S.C. § 1983 claims that they deprived her of equal protection and procedural due process in violation of the Fourteenth Amendment to the United States Constitution and common law claim of intentional infliction of emotional distress.[1] For the reasons set forth below, defendants' motion [Doc. # 67] is GRANTED as to Longmoor's federal claims, and the Court declines supplemental jurisdiction over the state law intentional infliction claim.

## I. Factual Background

Longmoor and her friend Lyndsey Keene currently reside at 24 Woodland Acres Road in Barkhamsted, Connecticut in an area known as the Woodland Acres Subdivision. Longmoor first moved into the subdivision in 1973 after purchasing its Lots 6, 9, 10, and 11, which totaled approximately eight acres of contiguous property. When Longmoor first moved to Woodland Acres, she accessed her home by way of Woodland Acres Road, then 900 foot unimproved dirt and gravel road that had been constructed by subdivision developer Burton Carroll. Carroll, however, had not constructed the road entirely within the 50–foot wide published right of way depicted in the subdivision plot plan filed with the Town of Barkhamsted but, to avoid rock structure, had located the road so that it encroached on some of the subdivision's lots. To date, Woodland Acres Road remains a private road and has never been accepted by the Town of Barkhamsted as public.[2] In the mid–1970s, Longmoor discovered that this road encroached on her

---

1. Longmoor's substantive due process and bill of attainder claims and all of plaintiff Lyndsey Keene's claims against these defendants were dismissed pursuant to Fed. R.Civ.P. 12(c). *See Longmoor v. Nilsen,* 285 F.Supp.2d 132, 136 n. 4, 144 (D.Conn.2003).

2. Developer Carroll still owns the 50–foot wide right of way.

property and the property of at least one other landowner in the subdivision.

In 1981, David Knauf wanted to purchase Lot 14 in the Woodland Acres Subdivision but was encountering difficulty securing a mortgage because Woodland Acres Road deviated from the published right of way across a small portion of Lot 14. To eliminate the encroachment problem and facilitate obtaining the mortgage, Knauf asked Longmoor if she would accept a quit claim deed to that portion of Lot 14, which he would designate Lot 14A. Longmoor agreed and gave Knauf $1.00 for the quit claim deed to newly created Lot 14A and Knauf retained an easement to cross the lot. Lot 14A, approximately one-tenth of an acre in size, is not contiguous to or visible from Longmoor's other lots. As other lots in Woodland Acres Subdivision were bought and sold over the years, other residents crossed Lot 14A to access their homes and properties. The stage was thus set for this seemingly innocuous small parcel of land to become the powder keg for this and other lawsuits.

In 1988, Longmoor had that portion of Woodland Acres Road encroaching upon her property moved to the published right of way where it was supposed to have been constructed in the first instance. This project had no effect on Lot 14A. Longmoor believed the other residents of Woodland Acres should have been required to share her road relocation costs but received no reimbursement. After others began purchasing lots in the subdivision with the intention of building their homes, Longmoor planned to use her quitclaimed right to

exclude from Lot 14A to recover some of these costs.

In March 2000, Longmoor met with other landowners and residents of Woodland Acres Subdivision to discuss easements to cross Lot 14A. No easements were agreed to at this meeting. In April 2000, on the advice of her real estate lawyer, Longmoor installed two posts and a chain to block vehicular passage across Lot 14A. Neighbors with permission to traverse Lot 14A agreed to take down the chain, pass through, and then put the chain back into position.[3]

On April 25, 2000, the Connecticut State Police were called to Woodland Acres Subdivision because the way across Lot 14A was blocked. Longmoor does not know who called the State Police but suspects it was William Langer, a neighbor to whom Longmoor had not given permission to cross Lot 14A but whose only access to his property was through Lot 14A. Longmoor's deposition testimony regarding the identity of the responding state trooper and what the state trooper said to her is contradictory, but ultimately she testified that she "believed" the trooper was defendant Trooper Laboy, *see* Longmoor Tr. at 109:9–13, and that, although she did not remember her specific conversation with Laboy, it was "obvious" that Laboy had come to order her to take the chain down and in fact she did recall Laboy ordering her to remove it, *see id.* at 109:14–111:1; *see also id.* at 113:19–24.[4] For purposes of summary judgment, the Court makes no credibility determinations and accepts her

---

3. For various reasons, Longmoor gave permission to some neighbors to cross Lot 14A to access their residences.

4. By affidavit, Trooper Laboy states that he did not respond to a complaint regarding a property dispute at Woodland Acres Subdivision on April 25, 2000, but worked the mid-

night shift from 11:00p.m. to 7:00a.m. on both April 24 and 25, and on both nights was assigned to Patrol 3, which encompasses the towns of Colebrook, Norfolk, Winsted and Torrington as well as a portion of Route 8 where it passes through those four towns.

identification of Laboy and the contents of his conversation.[5]

On April 30, 2000, Longmoor spied Langer with his vehicle on his lot in the subdivision and surmised that Langer could only have reached his property with his vehicle through her Lot 14A. Checking the chain, Longmoor discovered that one of the supporting posts had been lifted out of the ground and laid at the side of the road with the chain on the ground. Longmoor replaced it. Later, when several of Langer's friends wanted to leave the subdivision in their vehicles, Longmoor lowered the chain and allowed them to leave. At some point during this episode, the state police were summoned. Longmoor does not know who called them. Defendant Troopers Hazen and Sweeney responded. They had never before met Longmoor and Keene or been in the Woodland Acres subdivision.

After arriving, the troopers spoke with Langer while Longmoor and Keene remained a distance away. Langer, who had a dump truck on the scene, informed the troopers that he was a property owner in the process of constructing a home on Woodland Acres Road, that he was bringing in fill for his homesite, that the chain was already down on the ground when he first arrived hauling fill to his property that morning, that he had driven across the chain and otherwise not disturbed it, that the only way in and out of the subdivision to his property was over Lot 14A, and that he and other property owners in the subdivision were involved in litigation initiated by Longmoor and Keene over the ownership rights to Lot 14A.

Longmoor told Hazen and Sweeney that she owned Lot 14A and that she had a quitclaim deed to prove it but did not show them the deed. Keene told them he wanted to report vandalism to the posts and chain that had been erected by Longmoor to prevent vehicles from trespassing across Woodland Acres Road where it crossed Lot 14A. Troopers Hazen and Sweeney eventually told Longmoor and Keene that there appeared to be a dispute over who rightfully owned Lot 14A and who, if anyone, had a right to use the road over Lot 14A, that Longmoor and Keene should take the chain down or face arrest until the property dispute was settled particularly as there was a public safety issue concerning access to Lot 14A by residents and emergency vehicles, and that the two should make an appointment to see Bement and Barkhamsted First Selectman, Michael Fox, to discuss their complaints, bringing documentation of their claim to Lot 14A. Out of fear of arrest, Longmoor and Keene took the chain down and troopers Hazen and Sweeney then departed without making any arrests.

Trooper Hazen's uncontradicted affidavit details his handling of property disputes over his eleven years as a state police trooper prior to the Woodland Acres incident and the manner in which the state police generally handle such matters. When dispatched to a property dispute the state police seldom know who really owns the property in dispute or where the property boundaries lie. Because state police lack expertise in engineering or surveying, disputing neighbors are generally advised to seek legal advice from an attorney as to their property rights and then sue in civil court to enforce any such rights if neces-

**5.** Also on April 25, 2000, after the departure of Laboy, one of the posts supporting the chain blocking access to Lot 14A had been broken and the chain had fallen to the ground. On April 28, 2000, Longmoor fixed the broken post and replaced the chain, and, later the same day, telephoned the office of Barkhamsted Resident Trooper, John Bement, leaving a message asking to speak with him regarding the broken post.

sary. While the Woodland Acres Subdivision incident was the first time Hazen had encountered a property owner whose claimed ownership of part of a road prevented other landowners from accessing their homes through it, Hazen had dealt with other property disputes and, in keeping with Connecticut State Police practice, normally advised the parties to a dispute to seek a civil remedy to redress their complaints.[6]

On May 1, 2000, Longmoor and Keene left a copy of Longmoor's quit claim deed to Lot 14A and a partial plot map of the Woodland Acres Subdivision at Bement's office. The next day, Bement and Trooper Laboy went to Woodland Acres Road to Longmoor's residence. Longmoor remembers only a discussion about not keeping individuals from leaving the subdivision. During the conversation, Keene arrived with a copy of a map of Woodland Acres Subdivision and gave it to Bement. Later in the day, Bement conducted independent research in the land records for the Town of Barkhamsted. With the assistance of the town clerk, he located a subdivision plot plan for Woodland Acres and learned that the developer was Burton Carroll and that Longmoor possessed two parcels of land in the Woodland Acres Subdivision—a large multi-acre plot and a small .12 acre parcel recorded as Lot 14A. Because of his familiarity with the area of the subdivision, he immediately recognized that the actual roadway into Woodland Acres was not in the location depicted on Burton Carroll's subdivision plot plan. He also recognized that Lot 14A was not a properly configured building lot. Knowing that Woodland Acres Road was a private right of way not a public road, Bement surmised that the dispute centered around Lot 14A in some way.

Longmoor and Keene recall that, when they arrived at Bement's office later that day, Bement was sitting in his office typing a memorandum to State Police Troop B, notifying the troopers that Longmoor had a right to put up a chain to block passage over Lot 14A in the Woodland Acres Subdivision, and that Lot 14A was their property and they were entitled to protection. Longmoor thanked Bement. Before Longmoor and Keene departed, Bement suggested they provide keys to the fire marshal for emergency vehicles and that they post "no trespassing" signs every 50 feet along the border of Lot 14A. Longmoor and Keene then went to the hardware store and purchased the signs.[7]

---

**6.** At the time Hazen and Sweeney responded to Woodland Acres on April 30, 2000, Trooper Sweeney had just graduated from the Connecticut Police Academy and was being supervised by Trooper Hazen. Trooper Sweeney had limited prior experience as a police officer and had never before handled a similar property dispute complaint.

**7.** Bement's memory differs in some respects. He recollects that he, Longmoor, and Keene all agreed that the road which crossed Lot 14A was the only access into the subdivision and that the right of way depicted on the subdivision map did not exist. Bement acknowledged that Lot 14A appeared to be Longmoor's property but told Longmoor and Keene that it did not make sense that all of the lots in the subdivision beyond where

Woodland Acres Road crossed Lot 14A should be landlocked, that he knew Woodland Acres Road had existed for a period of time far longer than the quit claim deed indicated Lot 14A belonged to Longmoor, that the quit claim deed shown by Longmoor did not address the possibility that there could be a preexisting easement or some other similar claim to use Woodland Acres Road where it crossed Lot 14A, and that, based on the information provided, he could not agree that Longmoor and Keene had an absolute ownership interest in Lot 14A such that they could lawfully place a chain across Woodland Acres Road where it crossed Lot 14A and prevent access to the remainder of the subdivision. Bement told Longmoor and Keene that they should go to court to clarify the extent of their ownership interest in Woodland Acres Road where it

Next, Bement telephoned Assistant State's Attorney Andrew Wittstein at the Bantam courthouse and explained the property dispute situation between Longmoor and her neighbors. Wittstein advised Bement that Longmoor had a legal right to place a chain across the gravel road within the boundaries of Lot 14A, that Bement should take a case number if the chain was damaged and submit an arrest warrant affidavit based on the facts, that, under the circumstances, it was not likely that such an arrest warrant affidavit would be signed, and that Bement was not to arrest anyone for trespassing simply for crossing Lot 14A unless Longmoor first obtained an injunction barring others from using Woodland Acres Road where it crossed Lot 14A. Bement told Wittstein that Longmoor had been advised that a civil remedy was the best course of action and Wittstein agreed.

After speaking with Wittstein, Bement spoke with defendant Lieutenant Tolomeo, commanding officer of the North Canaan State Police barracks, and advised him of the property dispute over Lot 14A in the Woodland Acres Subdivision. Tolomeo advised Bement to write a memorandum regarding the property dispute and place it in the roll call book to alert other troopers of the status of Longmoor's claims. The memorandum dated May 2, 2000, reads:

Subject: Woodland Acres Road (Private Road)

Woodland Acres Rd is a private road at the end of Lavander Rd. There are several homes built along Woodland Acres. The developer, Burton Carroll did not build the Woodland Acres (Private Rd.)

to the specifications as outlined on the attached map. The dotted line indicates the existing gravel road that originated within the 50′ section that was designated the location that Woodland Acres Rd. would be built. The gravel road then enters onto Lot 14A which is owned by Lorraine Longmoor of 24 Woodland Acres. Lot 14A is a strip of land approximately 30′ wide and 150′ in length. Lorraine Longmoor has put two wooden post (sic) in place on both sides of the gravel road within her boundaries of Lot 14A. Lorraine Longmoor will be placing a chain extended across the gravel road prohibiting access through her property, Lot 14A.

Verified: Lot 14A does belong to Lorraine Longmoor and is acknowledged by all the residents of Woodland Acres. A–2 survey has been shown and verified that gravel road does in fact cross onto her property.

A.S.A. Andrew Wittstein has advised that Longmoor has a legal right to place the chain across the gravel road which is located within the boundaries of her property.

Tolomeo then telephoned Wittstein to discuss the matter himself and ensure that Wittstein's directions and advice were clear. Wittstein and Tolomeo agreed that no arrests would be made simply for crossing Lot 14A until such time as the property rights issue was clarified in court, and that an arrest could be made, however, for criminal incidents such as assaults, breaches of the peace, or threatening which occurred on the property. Wittstein empha-

crossed Lot 14A and to determine whether they had a legal right to landlock the other property owners. Bement informed Longmoor and Keene that he would seek the advice of the assistant's state's attorney in the Bantam courthouse who would be called upon to prosecute the case if someone was arrested,

that he could not tell them whether to take down the chain or to put it up, and that any actions could create circumstances in which the State Police would have to become involved if there occurred a physical or verbal altercation between neighbors.

sized that the role of the State Police was not to determine who owned Lot 14A or the extent to which Longmoor was justified in preventing others from crossing it but merely to maintain public safety and preserve peace until the controversy could be settled by judicial intervention.

Tolomeo informed Bement that he had also spoken with Wittstein and that he was going to view the Woodland Acres Subdivision and meet with Longmoor and Keene personally to ensure clarity regarding the position of the state police in the dispute surrounding Lot 14A. Tolomeo, Bement, and Laboy met with Selectman Fox. Fox was unable to clarify the ownership situation of Lot 14A but did inform Tolomeo that Longmoor had instituted several lawsuits against him and the Town of Barkhamsted as a result of the dispute. Tolomeo, Laboy, and Bement met with Longmoor and Keene at their home at 24 Woodland Acres Road that afternoon. The details of this meeting are in some respects in dispute.

Longmoor and Keene remember Tolomeo informing them that Bement's statements had to be revised, that Longmoor could not put up the chain because the State's Attorney had said she could not, that Tolomeo had some evidence showing the Langers had a right to cross Lot 14A, that Langer would be permitted to walk around, take down, and damage the chain, and that Longmoor and Keene would be subject to arrest if they blocked Woodland Acres Road at Lot 14A with the chain. They also recall that Tolomeo would not disclose any reason for the threatened arrest and that Tolomeo cryptically inquired

whether it was worth Longmoor's and Keene's health to continue pursuing the property dispute.

Tolomeo recalls that he clarified to Longmoor and Keene that the State Police would respond to complaints involving the property dispute over Lot 14A but that the dispute was primarily a civil matter, that arrests could be made for breaches of the peace or assaults, and that, until there was judicial resolution of the property rights involved, the State Police would simply enforce the public safety aspects surrounding any situation that erupted on Lot 14A. Tolomeo emphasized that, although the State Police recognized Longmoor's ownership of Lot 14A, the State Police could not discount the existence of other property claims based on the quit claim deed Longmoor had provided, that it was not the responsibility of the State Police to conduct a title search to clarify ownership rights to Lot 14A, that Longmoor needed to hire a private attorney to advise her on how best to clarify the extent of her property rights to Lot 14A, and that the State Police would enforce whatever rights a court determined Longmoor possessed. Tolomeo did not tell Longmoor and Keene that they could not block Lot 14A with their chain and Longmoor and Keene remained adamant that they wanted to do so. Similar to Hazen, Tolomeo's affidavit reflects that, although May 2 was the first time he had become involved in a property dispute between neighbors in a subdivision like Woodland Acres, he treated all parties involved in the same way as anyone else with a similar complaint or problem.[8]

---

8. The summary judgment record includes evidence of further involvement of Trooper Bement in Longmoor's property dispute, including responding to a complaint of Keene on May 5, 2000 regarding an unauthorized well-driller in the Woodland Acres Subdivision and preserving the peace at Lot 14A on May 17, 2000 when neighbor Langer had Longmoor's car towed from Lot 14A to facilitate bringing a modular home on a tractor trailer to his lot. There is no evidence, however, that any of the named state police defendants had any involvement with either of these incidents.

In June 2000, Longmoor filed a quiet title action in Connecticut Superior Court (CV–00–0082632–S) seeking to clarify her ownership rights to Lot 14A. The docket detail for the case indicates that judgment entered in favor of Longmoor on September 12, 2002, a motion to open judgment by Longmoor was denied August 25, 2003, and a motion for order by Longmoor was continued on September 23, 2003. The substance of the final judgment is not a part of the summary judgment record.

In July 2001, Langer used his own equipment and resources to relocate that portion of Woodland Acres Road which crossed Lot 14A to the published right of way where it should have been originally constructed according to the subdivision plot plan filed with the Town of Barkhamsted. Thus, after July 2001, Woodland Acres Road no longer crossed Lot 14A.

## II. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, a party moves for summary judgment against claims on which the non-moving party bears the burden of proof at trial, the moving party still shoulders the initial responsibility to inform the district court of the basis for its motion, namely, to identify those portions of the court or discovery record together with affidavits, if any, believed to demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then go beyond the pleadings and

by her own affidavits, or by evidentiary support found in the court or discovery record, designate specific facts establishing a genuine issue of material fact on any element essential to the non-moving party's case that was sufficiently called into question by the moving party. *See id.* The "District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), mindful that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The District Court's ultimate concern is "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

## III. Discussion

A claim under 42 U.S.C. § 1983 has "two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998); *see also Giordano v. City of New York,* 274 F.3d 740, 750 (2d Cir.2001). The State Police defendants do not dispute that they acted under color of state law but argue that they did not as a matter of law violate Longmoor's constitutional rights to equal protection and procedural due process.

### A. Equal Protection

■ Longmoor asserts a class of one equal protection claim under *Village of*

*Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curiam). Pre-*Olech,* a selective enforcement claim based on the Equal Protection Clause in the Second Circuit required a plaintiff to demonstrate "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Giordano v. City of New York,* 274 F.3d 740, 750–51 (2d Cir.2001). Post-*Olech,* Second Circuit decisions have provided mixed signals regarding whether the second element of a class of one selective enforcement claim continues after *Olech* to require a showing of such improper motivation or can be supported merely by evidence of irrational and wholly arbitrary conduct associated with intentional disparate treatment. Soon after *Olech,* the Second Circuit stated that proof of subjective ill-will was not an essential element, *see Jackson v. Burke,* 256 F.3d 93, 97 (2d Cir.2001), but subsequently described *Jackson*'s observation as *dicta* and explicitly declined to address whether *Olech* removed the requirement of impermissible motivation. *See Harlen Assoc. v. Incorporated Village of Mineola,* 273 F.3d 494, 499–500 (2d Cir.2001); *see also Hayut v. State University of New York,* 352 F.3d 733, 754 n. 15 (2d Cir.2003); *DeMuria v. Hawkes,* 328 F.3d 704, 707 and n. 2 (2003); *Giordano,* 274 F.3d at 751. More recently, the Second Circuit has implied that *Jackson*'s observation was correct, distinguishing between a "selective prosecution" equal protection claim having the two traditional elements and a "*Olech*-based equal

protection claim" which does not require proof of selective treatment based on impermissible considerations but only selective treatment with no rational basis for differentiation. *See Cobb v. Pozzi,* 363 F.3d 89, 109–10 (2d Cir.2004).[9]

There is no need to select among the alternative requirements for the second element of Longmoor's claim because there is no evidence in the record supporting the first element. There is no evidence of the existence of any property owners similarly situated to Longmoor much less that the four named State Police defendants (Laboy, Sweeney, Hazen, and Tolomeo) treated Longmoor different than such individuals. In opposition to summary judgment, Longmoor has failed to direct the Court to any evidence regarding the named defendants' interaction with any other similarly situated landowners, for example, property owners seeking to exclude others from trespassing on their property. Thus, there is no evidence on which a rational jury could find for Longmoor against the State Police defendants on her *Olech* claim.

Longmoor essentially concedes her failure to raise a genuine issue of fact regarding the State Police defendants' disparate treatment but appears to argue that proof of disparate treatment is unnecessary to prevail, citing *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995) and *Falls v. Town of Dyer,* 875 F.2d 146 (7th Cir.1989). *See* Opp'n [Doc. # 74] at 6–9 (unnumbered). Longmoor's argument lacks merit. Every Second Circuit case cited in this section requires disparate treatment of similarly situated individuals as an essential element of an equal protection claim. Moreover, in vacating and remanding a 12(b)(6) dismiss-

---

**9.** For a recent summary of conflicting authorities, including Second Circuit precedent, and exhaustive discussion of whether class of one *Olech* equal protection claims should require proof that official action was solely motivated by improper motives, see *Bell v. Duperrault,* 367 F.3d 703, 709–13 (7th Cir.2004)(Posner, J., concurring).

al of an *Olech* class of one claim that included allegations that a defendant police officer intentionally disregarded the plaintiffs' property rights in response to their complaints about a neighbor, the Second Circuit noted plaintiffs "face a significant hurdle in finding evidence to prove their allegations of selective enforcement and unequal treatment." *DeMuria*, 328 F.3d at 707. *Falls* and *Esmail* are not to the contrary. *Falls* required the plaintiff to prove, among other things, that the defendant town enforced its portable sign ordinance against him and not his competitors, and *Esmail* required plaintiff to prove, among other things, that defendant mayor granted or renewed others' liquor licenses while denying plaintiff's notwithstanding that the others had engaged in conduct similar to or worse than plaintiff's infractions.

## B. Procedural Due Process

■ Longmoor claims she was entitled to notice and a hearing before the State Police Defendants facilitated the trespasses of her neighbors on Lot 14A of the Woodland Acres Subdivision by ordering her to remove the chain blocking movement across the parcel. Longmoor places particular emphasis on her facts that she was forced to remove the chain under threat of arrest even after Bement explicitly told her she had a right to exclude others from Lot 14A. The State Police Defendants dispute Longmoor's version of events, claiming they never threatened Longmoor and Keene with arrest or forced them to remove the chain (other than to prevent imprisonment of others) but acted neutrally by preserving the peace and encouraging Longmoor to obtain judicial clarification regarding the scope of her right to exclude others from

Lot 14A. If the legal resolution of Longmoor's procedural due process claim rested on the resolution to this factual dispute, Longmoor's claim would have to be tried, although defendants' briefing often appears to forget their summary judgment motion cannot succeed where accounts differ on material facts. However, Longmoor's procedural due process claim must fail as a matter of law because, as defendants also argue, accepting her version of events leads only to the conclusion that any process to which she was due was available through adequate post-deprivation state remedies.

Generally "it has become a truism that 'some form of hearing' is required before the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).[10] However, "[procedural] due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances [but] is flexible and calls for such procedural protections as the particular situation demands," *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997)(quotations and citations omitted), and therefore the determination of what process is due, including the timing and nature of the required hearing, is made by weighing the well-known factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

10. The State Police defendants do not contest in the present motion that Longmoor had a federally protected property interest in Lot 14A.

As explained in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), two Supreme Court cases, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), represent an application of the *Mathews* factors "to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon,* 494 U.S. at 129, 110 S.Ct. 975. Taken together, *Parratt* and *Hudson* hold that, where the intentional deprivation of a property interest results from the random and unauthorized act of a state employee and not pursuant to some established state procedure, the State cannot predict or foresee such deprivation and therefore is not required under the Fourteenth Amendment to provide a predeprivation hearing if adequate postdeprivation state remedies exist. Thus, there was no due process violation in *Parratt* for prison officials' negligent loss [11] of hobby materials ordered by mail by an inmate where Nebraska provided a tort claims procedure for state prisoners to hear the claim and compensate Parratt for the value of the materials.

> The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive how the State could

provide a meaningful hearing before the deprivation takes place.

*Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. No procedural due process violation was found in *Hudson* for a prison official's intentional destruction of an inmate's non-contraband personal property during a search of the inmate's locker and cell for contraband where Virginia provided several common-law remedies for the inmate seeking compensation for loss of his property.

> The underlying rationale of Parratt is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur.... The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct.

*Hudson,* 468 U.S. at 533, 104 S.Ct. 3194.

By contrast, the *Parratt* rule was held inapplicable to the termination of a complainant's cause of action by operation of an Illinois statute as jurisdictionally barred if a state official failed to take action on the complainant's charge of discriminatory conduct within 120 days of the charge having been brought.

> Here, in contrast [to *Parratt*], it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt* was not designed to

---

**11.** As pointed out in *Zinermon, Parratt* was decided before the Supreme Court held in *Daniels v. Williams,* 474 U.S. 327, 336, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) that "a

negligent act by a state official does not give rise to § 1983 liability." *Zinermon,* 494 U.S. at 129 n. 14, 110 S.Ct. 975.

reach such a situation.... Unlike the complainant in *Parratt,* Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards. *Logan,* 455 U.S. at 436, 102 S.Ct. 1148; *see also Hudson,* 468 U.S. at 532 n. 13, 104 S.Ct. 3194 ("In Logan, we examined a claim that the terms of an Illinois statute deprived the petitioner of an opportunity to pursue his employment discrimination claim. We specifically distinguished the case from Parratt....").

In *Zinermon,* the Supreme Court extended the *Parratt* rule to deprivations of liberty and refined the scope of its application, including the meaning of "random and unauthorized." It held the *Parratt* rule inapplicable to the "voluntary" admission to a state mental hospital of a mental patient who was known or should have been known to be incompetent to provide informed consent where the admitting hospital personnel possessed broad powers and concomitant duties under Florida's comprehensive statutory scheme for admission of persons to mental hospitals to effect confinement of an individual and to implement procedural safeguards against unlawful confinement. Therefore, Florida law permitting suit against the admission personnel for unlawful confinement was inadequate to satisfy the demands of the Due Process Clause; the procedural safeguards used for Florida's involuntary admissions were required. *Parratt* and *Hudson* were distinguished on three grounds. *See Zinermon,* 494 U.S. at 136–38, 110 S.Ct. 975. First, the precise timing of an erroneous confinement to a mental hospital was considered foreseeable because the very nature of mental illness suggested that a person requesting treatment might be incapable of informed consent and thus erroneous confinement could be precisely pinpointed to the moment ad-

mission forms were provided for signature after state officials with delegated admission powers failed to question the person's faculties. By contrast, such precision of prediction is not possible with prison guards' negligent losses of property or intentional harassment of prisoners even if the State can anticipate both kinds of activity may occur. Second, a pre-confinement procedure for involuntary admission to a mental hospital was already in place and the same officials who admitted a voluntary mental patient needed only ensure such procedure was followed. By contrast, "it borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct," and similarly, "it would be absurd to suggest that the State hold a hearing to determine whether a guard should engage in [the malicious destruction of a prisoner's property]." *Zinermon,* 494 U.S. at 137, 110 S.Ct. 975 (quotation omitted). Third, the Court explained, an "unauthorized" act does not include every violation of state statute as it does not extend to deprivations of constitutional rights by state actors where the State has delegated the power and authority to them to effect the deprivation and the concomitant duty to initiate the procedural safeguards established by state law to guard against such deprivations. *See id.* at 138, 110 S.Ct. 975.

The Second Circuit has noted that "the *Zinermon* decision has generated considerable confusion among the courts of appeals" and that what constitutes random and unauthorized conduct under *Zinermon* is a "legal thicket." *Locurto v. Safir,* 264 F.3d 154, 173 (2d Cir.2001); *see also* 1 Martin A. Schwartz, Section 1983 Litigation § 3.07[E][1], at 3–182 (4th ed. 2003 & 2004–1 Supp.). Post-*Zinermon* Second Circuit decisions have found the *Parratt* rule applicable, and thus post-deprivation

remedies sufficient to satisfy due process, where the chief of the Nassau County Police Department's Internal Affairs Unit ordered confiscation of an officer's license to drive where the chief had no authority to suspend driving privileges (a power relegated to the State of New York), *see Gudema v. Nassau Cty.*, 163 F.3d 717, 724–25 (2d Cir.1998), and where the director of the mayor's office of contracts and New York City's chief procurement officer issued a letter to the heads of all New York agencies ordering no procurement action with a contractor and cancellation of all existing contracts with that contractor as they came up for renewal because the director's actions were in violation of New York's City Charter and Procurement Policy Board rules, *see Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir.1996).[12] Post-*Zinermon* Second Circuit decisions have found the *Parratt* rule inapplicable, and thus some form of pre-deprivation remedy required, where the chief of the ophthalmology department at Harlem Hospital Center and director of the residency program and other attending physicians changed the method of selecting the chief resident thereby denying plaintiff the position; the program directors acted within their delegated authority to preclude the plaintiff from the position, had authority to inform anyone who stood to be adversely affected by the change (including plaintiff) and provide them with an opportunity to demonstrate how they met the new criteria or that the new criteria

should not apply to them, and in fact carefully deliberated among themselves before changing the selection method, *see Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 784–86 (2d Cir.1991). Where the commissioner of the New York State Department of Health summarily suspended a radiologist's medical license after investigation and issued statements to the press announcing the suspension and asserting the radiologist's incompetence and potential criminal conduct, predeprivation remedies were also required. The commissioner was a high ranking official with final authority on many department matters, including communications to the press and authority to summarily suspend the radiologist's license, by statute summary suspensions were public upon issuance, and the commissioner had the duty to ensure that the department followed proscribed procedures governing summary suspensions, *DiBlasio*, 344 F.3d at 302–03.

Applying these principles to Longmoor's version of events and undisputed record facts and assuming arguendo that the State Police Defendants knew that Longmoor had a right to exclude her neighbors from Lot 14A leads to the conclusion that the State Police defendants' actions were random and unauthorized. The State of Connecticut could not have predicted with precision the timing of Laboy's, Hazen and Sweeney's, and Tolomeo's deprivation of Longmoor's right to exclude others from Lot 14A. While the State Police are charged with handling a wide range of

---

**12.** It appears difficult to reconcile the *Hellenic* decision with the Supreme Court's observation in *Zinermon* that mere violation of governing law does not make official action unauthorized because the official in question may have delegated power both to effect the deprivation complained of and to guard against such deprivation by implementation of procedural safeguards. *See Zinermon*, 494 U.S. at 138, 110 S.Ct. 975. Subsequently,

the Second Circuit clarified that neither had it found in *Hellenic* that the director of the mayor's office of contracts and New York City's chief procurement officer had authority to suspend procurement for the complainant contractor or the duty to guard against an erroneous suspension nor had the parties' raised the issue of the director's authority in such matters. *See DiBlasio v. Novello*, 344 F.3d 292, 303 n. 3 (2d Cir.2003).

conduct and situations, including property disputes, and the State can anticipate that its law enforcement officers may intentionally deprive landowners of property rights, such deprivation cannot be pinpointed to specific moments. There is no procedure in place for Connecticut State Police officers to adjudicate on the spot property disputes between bickering neighbors. To the contrary, the State Police have no responsibility to clarify property rights, are not trained to do so, and follow a standard procedure of telling disputing property owners to seek a civil remedy because they seldom know when called to a property dispute who the real owners are, what the precise nature of their rights are. To paraphrase only slightly, "it would be absurd to suggest that the State hold a hearing to determine whether [police personnel] should engage in [the intentional deprivation of a landowner's property rights]." *Zinermon,* 494 U.S. at 137, 110 S.Ct. 975. Finally, the State Police have no powers delegated to them to declare property rights and adjudicate property disputes or the duty to implement procedural safeguards to guard against such deprivations. Rather, the courts perform that function and the officers, after judicial clarification, carry out the orders of the courts with respect to property. The named defendants, including Tolomeo, are not high ranking officials with final decision making authority on the delineation of property rights and can only direct property owners to seek judicial remedies and implement court orders.

Having determined that the State Police Defendants' actions, as related by Longmoor, were random and unauthorized under *Parratt* and progeny, it is now necessary to consider whether the State of Connecticut provides Longmoor with adequate postdeprivation remedies for the State Police Defendants' facilitation of trespasses on her land. The State Police Defendants argue that adequate post-deprivation remedies were available to Longmoor in the form of a common law quiet title action in Connecticut Superior Court, *citing Tadros v. Middlebury Medical Center, Inc.,* 263 Conn. 235, 820 A.2d 230 (2003); *Schwartz v. Murphy,* 74 Conn. App. 286, 812 A.2d 87 (2002). Indeed, Longmoor filed a quiet title action over Lot 14A and apparently prevailed in that suit. There is nothing in the record indicating that the State Police Defendants are unwilling to or have not enforced the judgment in Longmoor's favor. The State Police Defendants also point to Longmoor's right to sue the State of Connecticut pursuant to Conn. Gen.Stat. §§ 4–141 to 4–165, which permits claims for damages resulting from tortious conduct of state police officers in the performance of their official duties. Longmoor does not challenge the adequacy of the post-deprivation remedies defendants claim are available to her under state law, and there is no basis in the record from which to conclude that they would have been insufficient under *Parratt,* 451 U.S. at 543–44, 101 S.Ct. 1908.

Accordingly, taking the factual record most favorably to Longmoor, what is shown is at best random and unauthorized deprivations of Longmoor's right to exclude trespassers from Lot 14A and adequate state remedies to fully compensate her for any corresponding loss. Therefore as a matter of law Longmoor has suffered no violation of her procedural due process rights.

## IV. Conclusion

For the reasons set forth above, the State Police Defendants' motion for summary judgment [Doc. # 67] is GRANTED. Inasmuch as Longmoor and Keene have no remaining federal claims against the

State Police Defendants, and Longmoor's intentional infliction of emotional distress claim against them does not arise from the same controversy as Longmoor's remaining federal claims against the Barkhamsted defendants, the Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over plaintiff's remaining state claim and it is dismissed without prejudice.

IT IS SO ORDERED.